In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-23-00102-CV

**THE BANK OF NEW YORK MELLON, F/K/A THE BANK
OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS
OF THE CWABS, INC., ASSET-BACKED CERTIFICATES,
SERIES 2007-1, Appellant**

**V.**

**DAVID HALL AND TERESA HALL, Appellees**

_____

**On Appeal from the 136th District Court
Jefferson County, Texas
Trial Cause No. D-203632**
_____

**MEMORANDUM OPINION**

Appellant/Defendant The Bank of New York Mellon, f/k/a The Bank of New York, as Trustee for the Certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-1 ("BNYM" or "Appellant"), appeals a Final Judgment after a jury verdict in favor of Appellees/Plaintiffs David Hall and Teresa Hall ("the

Halls" or "Appellees"). We affirm in part, conditionally affirm in part with remittitur suggested, reverse and render in part, and reverse and remand in part.

## Background and Procedural History

In 2000, the Halls obtained a home equity loan for $44,800 from New Century Mortgage Corporation, and the loan was assigned to BNYM in 2009. According to the Halls, in 2011 they obtained payoff information from the lender and were informed the payoff was $45,146.37. The Halls submitted a certified check for that amount to Bank of America, the loan servicer on the loan until December 2011, when SLS[1] became the loan servicer. In 2015, the Halls learned from BNYM that the loan had not been paid off due to an error by Bank of America, that $18,946.43 had not been applied to the loan, and that because the Halls had not been making payments on the loan, BNYM was foreclosing on the home. The Halls hired legal counsel and sued BNYM in 2016, and on December 22, 2017, the Halls and BNYM entered into a Rule 11 agreement (the "Rule 11 Agreement") on that suit. After receiving and executing a release, the Halls nonsuited their case against BNYM.

---

[1] SLS is "Specialized Loan Servicing," the loan servicer for, and agent of, BNYM. The parties do not dispute that SLS's actions bound BNYM, and at times during trial, BNYM and SLS were referred to as "the bank" and considered one and the same. When discussing the background and evidence in this case, we refer to BNYM and SLS interchangeably as the parties often do.

In April of 2019, the Halls sued BNYM in the current suit arguing they complied with the Rule 11 Agreement, but BNYM did not.[2] The Halls asserted numerous causes of action against BNYM in their Original Petition, but at trial the Halls only pursued their claims against BNYM for breach of contract, negligent misrepresentation, and violations of the Texas Debt Collection Act ("TDCA"). The jury found that BNYM failed to comply with the Rule 11 Agreement, that BNYM made false and misleading misrepresentations, that BNYM made a negligent misrepresentation, and the jury awarded a total of over one million dollars in damages to the Halls. BNYM filed this appeal.

## Evidence at Trial

**Testimony of John Pat Parsons**

John Pat Parsons testified that he was hired as the Halls' attorney in 2015 when BNYM had instituted a home equity loan foreclosure suit against the Halls. According to Parsons, he also filed a lawsuit in 2016 on behalf of the Halls against BNYM for breach of contract and improper foreclosure, which was consolidated with the foreclosure suit (the consolidated action is globally referred to herein as the "first suit"). Parsons recalled that in December of 2017, just prior to trial in the first

---

[2] The Halls also sued the law firm (Hughes Watters Askanase, LLP) and the lawyer (Jennifer McCammon) with that firm that represented BNYM at the time of the Rule 11 Agreement. Prior to the Halls' trial against BNYM, the trial court granted summary judgment in favor of Hughes Watters Askanase, LLP and McCammon, and those defendants are not parties to this appeal.

suit and after an unsuccessful mediation, the Halls and BNYM entered into a Rule 11 Agreement to settle the claims in the first suit.

Copies of e-mails from December of 2017 were admitted at trial and published to the jury as Exhibits 9 and 10. The emails are between Parsons and Jennifer McCammon, an attorney with Hughes Watters & Askanase, LLP ("Hughes Watters") who represented BNYM in the case, and contain discussion of the Rule 11 Agreement. The e-mail string between Parsons and McCammon on December 19, 2017, three days before the Rule 11 Agreement was finally signed, includes the following:

> [from Parsons to McCammon:]
> I could talk to my clients [the Halls] about agreeing to the following:
> $57,207.25
> -$19,244.39 (Feb 2018 pmt)
> -$582.16 (Mar 2018 pmt)
> -$582.16 (Apr. 2018 pmt)
> =$36,799.24 (this amount then refinanced over 18 years at 4%)
> Taxes and ins. escrowed.
> Letter to credit bureau.
> Court costs to Plaintiff not to exceed $1250.
> [From McCammon to Parsons:]
> . . . I've passed this along to my client. I will let you know when I hear a response[.]
>
> [From Parsons to McCammon:]
> I know you are still checking with your client about refinancing the $36,000 amount, but your client has already authorized you to resolve this matter for the following terms correct:
> > $57,207.25 (this amount refinanced over 18 years at 4% interest)
> > The first three payments toward the $57,207.25 amount would be:
> $19,244.39 (Feb 2018 pmt)

4

$582.16 (Mar 2018 pmt)
$582.16 (Apr. 2018 pmt)
      Taxes and Ins. escrowed.
      Letter to credit bureau.
      Court costs to Plaintiff not to exceed $1250.

[From McCammon to Parsons:]
A very small detail, the total is $57,207.95 (my apologies if I agreed with the $57,207.25 over the phone). Additionally, I did not get final approval from my client regarding the letter and the $1,250 court costs. I hope that if we can come to terms on everything else, we can work out those small details.

[From Parsons to McCammon:]
We are in agreement to settle and resolve this matter.
The total debt owed on this note after off-sets by SLS will be $57,207.95 (which will be refinanced at 4% interest for 18 years).
My clients will make timely payments of:
$19,244.39 (Feb 2019 pmt)
$582.16 (Mar 2018 pmt)
$582.16 (Apr. 2018 pmt)
Which will be credited toward the debt owed above….
      Taxes and Ins. escrowed.
      Letter to credit bureau by Defendant indicating that a mistake was made applying a payment to the Note, which created a default.
      Court costs to Plaintiff for $1250.
We need to finalize this matter before Dec. 22, 2017 as I will be out of the office after that date until 2018.

The following is the e-mail string between Parsons and McCammon on December 20 and 21, 2017, two days prior to the day the Rule 11 Agreement was signed, in relevant part:

[From Parsons to McCammon:]
Please send me a copy of the final agreement in writing (signed) so that we may notify the court that the case is resolved.

[From McCammon to Parsons:]

I apologize if it seemed like we were in agreement on the terms of a settlement. I have not yet received final settlement approval of the terms from my client, so I am not in agreement yet. I hope to hear from them today, my client contact was discussing it with others at SLS. Additionally, I know the 22nd is rapidly approaching, so hope to give you a definitive answer today.

[From Parsons to McCammon:]
Any update? My clients are continuing to call.
I will be out of the office at 1pm on Friday.

[From McCammon to Parsons:]
SLS is still evaluating the settlement offer at this time. I will reach out to you as soon as I hear an answer from them.

On December 22, 2017, the day the Rule 11 Agreement was signed by the parties,

the following e-mails were exchanged between McCammon and Parsons:

[from Parsons to McCammon:]
I am disappointed that we were not able to get this one resolved……as I had conceded to the majority of your client's terms.
Michael Lindsay is a partner/founder of the firm and will be stepping in on this file after 1pm today[.]

[From McCammon to Parsons:]
I am sorry we couldn't get this resolved. Thank you for your work on trying to settle and for the update on who is handling the case going forward.
. . .

[From Parsons to McCammon:]
. . . [My clients] want a letter simply stating that they made a payment that was not applied to their account which sent the note into default and foreclosure due to no fault of their own in 2011. . . .

[From McCammon to Parsons:]
I've consulted with SLS and they are unwilling to negotiate regarding the credit reporting letter. SLS was not servicing the loan at the time when the payment was made, however, records from the prior servicer

6

reflect one or more discrepancies regarding the instructions that the Halls[] provided regarding how payment was to be applied to their account. Without the prior servicer independently verifying their error, if any, SLS cannot and will not adjust the credit reporting or provide the requested correspondence.

As discussed, SLS will provide a loan modification as follows:
- The total debt owed on this note after off-sets by SLS will be $57,207.95 (which will be refinanced at 4% interest for 18 years).
- The Halls will make timely payments of:
  $19,244.39 (Feb 2018 pmt)
  $582.16 (Mar 2018 pmt)
  $582.16 (Apr. 2018 pmt)
- Which will be credited toward the debt owed above.
- Taxes and Ins. escrowed.

SLS is also prepared to enter into a separate agreement, independent of the settlement agreement, for the payment of $1,250 [for court costs] with the Halls.

Please discuss this with your clients and let me know their response.

[From Parsons to McCammon:]
If SLS begins to receive payments, will it report "timely payments being made."

My clients are upset. I am trying to come up with something that will satisfy them pertaining to the credit reporting.
[From McCammon to Parsons:]
SLS said the following:

"During the trial [period], the credit reporting will not be set as current. If the trial is complete and a final mod is accepted and cured, then yes, credit reporting would begin as positive once the loan is brought current through modification."

[From Parsons to McCammon:]
The terms as written are accepted……no letter to bureau, $1250 payment to Halls and my firm and modified note.

SLS to report current payments of modified note if Halls comply with agreement after the 3 payments.

Please send to me formally in writing to be signed by Michael Lindsay for the Halls.

Once received, we will notify court of settlement so 1/2/18 trial can be cancelled.

[From McCammon to Parsons:]
Great news! I am drafting settlement documents and will email it to you and Michael this afternoon.

[Again from McCammon to Parsons:]
My plan is to draft a Rule 11 agreement for now and get that to y[']all to sign so we can file it with the Court. I'm not certain SLS will have someone on hand to sign formal settlement documents next week, but I'll draft the formal agreements Wednesday when I return to the office after Christmas.

Exhibit 3 is a December 22, 2017 letter to Parsons from McCammon admitted into evidence at trial, titled as a Rule 11 Agreement and states as follows:

<u>RULE 11 AGREEMENT</u>

Dear Mr. Parsons[]:

Pursuant to our communications, please let this letter serve as our agreement to the following:

1.  SLS will provide a loan modification for the Halls[] as follows:

    • The total debt owed on the modified note after set-offs by SLS will be $57,207.95.

    • The modified note will be at 4.00% interest per annum for a period of 216 months or 18 years.

2. The Halls will enter into a trial period plan for a period of three months. The Halls agree to make a cash contribution of approximately $19,244.39 due on or before February 1, 2018. The Halls[] will then make two payments of $582.16 in March and April 2018.

3. The Halls' monthly payment for principal and interest will be $370.61.

4. Taxes and insurance will be escrowed.

5. SLS agrees to pay the Halls the sum of $1,250.00 within 30 days of execution of a formal settlement agreement. The check will be made payable to David Hall, Teresa Hall, and Lindsay, Lindsay & Parsons.

6. SLS will provide credit reporting in compliance with its standard procedures. When the loan is current, payments successfully made on time will be reported as current.

The parties understand that this letter contains only a basic outline of the settlement agreement reached between them and that more formal settlement documents will be forthcoming.
. . .
If you are in agreement with these terms, please sign in the space below and return this signed letter agreement to my office at your earliest convenience. I will see that it is filed with the Court pursuant to Tex. R. Civ. P. 11.

Please contact me if you feel that this letter does not accurately outline the agreement reached between the parties. Thank you in advance for your prompt attention to this matter.

The letter was signed by BNYM's counsel and then upon receipt it was signed as "Agreed" by Parsons on December 26, 2017.

Parsons testified that a Rule 11 agreement is a binding and enforceable contract between the parties, and that in this case, the parties reached an agreement

9

and reduced it to writing. He testified that the fact that the parties had agreed to settle the case was not only clear from the language in the Rule 11 Agreement but also clear because of the language in the letter stating that the trial court would be notified that the case had been settled so that the case would be removed from the trial docket for the January 2, 2018 trial setting. According to Parsons, he and McCammon had a "very detailed agreement" that included that the Halls' payment of roughly $19,000 would be credited to the $57,207.95 loan amount, and Parsons testified that any suggestion otherwise contradicted the agreement they had. Parsons further testified that the e-mails he and McCammon exchanged prior to signing the Rule 11 Agreement demonstrate their agreement that the $19,000-figure payment to be paid initially by the Halls under the loan modification would be credited to the debt of $57,207.95.

Exhibit 8, admitted at trial, is a December 26, 2017 e-mail from Parsons to McCammon, stating:

> Jennifer,
>
> This signed document will be returned to you on Wednesday. Please file it with the Court. My assistant will notify the court that the case has settled and to remove us from the docket.

The exhibit also reflects McCammon's e-mail reply the following day:

> John,
>
> Thank you for the update. I will await the Rule 11 Agreement and see that it is filed.

10

Thank you,
Jennifer

BNYM's attorneys filed the signed Rule 11 Agreement with the trial court in the first suit on December 27, 2017. The claims in the first suit were subsequently dismissed.

According to e-mails admitted at trial, Parsons e-mailed McCammon on January 5, 2018, asking for the proposed releases and settlement documents so that they could be filed at the court's request within ten days of the Rule 11 Agreement being filed. On January 10, 2018, another attorney with Hughes Watters also handling the case, Nathan Milliron, sent an e-mail and attached the Settlement Agreement and Release and stated that the attached version had been approved by BNYM, and Milliron asked Parsons to have the Halls execute it. Parsons responded in his January 15, 2018 e-mail, in which he stated he was attaching a new version with two revisions "to clarify (1) that the three trial period payment(s) being made will be credited toward the modified loan amount as was previously discussed and (2) where payments are to be made." On the proposed Settlement Agreement and Release admitted into evidence, Parsons had handwritten in that the trial period three payments to SLS as well as the monthly payments thereafter would be made at SLS (with blanks left for SLS's location to be filled in), and Parsons added additional language that "these payment amounts will be applied toward the (new) Modification Agreement, which has a total amount owed of $57,207.95." Parsons

11

testified that his handwritten modifications to the release documents were consistent with the Rule 11 Agreement and with McCammon's December 22, 2017 e-mail, but that BNYM never signed the Settlement Agreement and Release document.

Parsons testified that the Halls paid $19,244.39 on February 1, 2018, and two payments of $582.16 each on March 1, 2018 and April 1, 2018. Parsons recalled that the Halls were committed by the Rule 11 Agreement to make the three payments, which they did, and because the next payment under the modification agreement was due on May 1, 2018, Parsons expected to receive the modification documents by that date so that the Halls and BNYM could execute the modification agreement. Parsons testified that he did not receive the modification documents by May 1, 2018.

After Parsons received no response to his e-mail inquiries about where the Halls were to send the payments under the agreement, he e-mailed the lawyers representing BNYM and told them, "We are about to be forced to make a payment under an agreement that I am not even sure we have reached. Any update?" Counsel for BNYM responded as follows:

> We drafted the settlement agreement to track the language in the executed Rule 11 Agreement so that it would help to expedite our client's internal approval of the agreement. I'm happy to submit the proposed changes to the settlement agreement for approval, but I am not yet authorized to make them.
>
> We will get you a further update when we have received our client's approval to the revised settlement agreement.

12

On January 29, 2018, Parsons replied that "[i]t seems as though it would be obvious that my clients would get credit for the payments they are making to the modified note (modified amount per the Rule 11 settlement agreement), but I want it to be spelled out in the release so there is no confusion." Later that same day Parsons e-mailed BNYM's counsel and stated, "I did not get clarification on where to mail the payment so it is being sent to your office on behalf of your client (the Defendant and SLS). The check is attached and has been mailed to your office." On February 20, 2018, Parsons sent BNYM's counsel the following email:

I am still waiting to hear from you regarding the final release.
My client is in compliance with the terms of the Rule 11 Agreement and will continue to submit payments as agreed.

I would like to be able to review a proposed release that complies with the terms of our Rule 11 Agreement.

On March 23, 2018, Parsons sent a follow-up email:

Attached is proof of mailing of the 3rd payment and final payment under the Rule 11 Agreement.

Please send the modification agreement, payment of $1,250 and we are requesting an amortization schedule showing the initial prepayment as well as the three monthly payments already made under the modified note beginning Feb. 1, 2018.

Hopefully we can conclude this matter shortly.

On April 3, 2018, Parsons again e-mailed the following to both attorneys representing BNYM:

> I have not heard anything from you since sending the 3 initial payments. Please confirm you are sending the modification as well as the settlement check and a loan amortization schedule showing the modified amount and the three applied payments.
>
> If I do not hear from you, I will have to take action as my clients['] fourth payment will be due in less than 1 month.

On April 9, 2018, Parsons sent BNYM's attorneys an e-mail stating that Parsons had not heard from either of them since January 26, 2018 and asking them to confirm that they were receiving Parsons' e-mails and that his prior requests were being handled. On April 12, 2018, Parsons e-mailed the attorneys again, this time stating:

> I am sending a FORMAL REQUEST (per Title 7, Part 5, Chapter 83, subch. A, Div. 10 (section 83.826) of the Texas Administrative Code) asking that your client provide a written payoff under the recently completed modification agreement.
>
> My clients want to know how much is owed on the Note after the last three payments made under the Rule 11 agreement were applied.
>
> If I can see that the payments were properly applied to the Note/Modification, I think we can get this matter resolved without the need for additional court intervention.

On April 18, 2018, McCammon responded that she was confirming receipt of the payments and "will work with the client to get you the written payoff and will forward to you once we receive it." On April 25, 2018, Parsons sent the following reply to McCammon:

> Attached is the agreed to Rule 11 and the amortization schedule for the modification (based on the Rule 11 Agreement).

I do not want to have the court involved but we are on the 4th payment now (due beginning of May 2018)---we do not know the amount to add for escrow of taxes/insurance each month, we do not have the modification to review, we do not have a payoff to confirm that the modification is correct per the terms of the Rule 11 agreement.

It appears to me that as of today, $38,120.36 is due on the Note before the April payment. Can you send the payoff to confirm that amount? Also can you send the modification documents?

After McCammon responded that she would see if Milliron had the information Parsons needed, Parsons replied back as follows:

Attached is a letter with the fourth payment, I do not know what else to do at this time other than to continue payments and wait for the payoff figure.

If the payoff figure is in line with our amortization schedule figure, then all we need is the modification agreement to sign.

I am trying to get this file wrapped up for all involved.

Parsons testified that he was concerned and the situation was problematic because the Halls' payments in compliance with the Rule 11 Agreement were being returned because the loan modification had not been processed by BNYM, Parsons had e-mailed "over and over and over again" asking BNYM's counsel for the documents executed by BNYM to no avail, and the fact that the payments were being returned by SLS on BNYM's behalf because the payments were less than the amounts due in BNYM's system despite being the accurate amounts under the Rule 11 Agreement, and this put the Halls at risk of BNYM foreclosing on their home. On May 22, 2018, Parsons sent BNYM's counsel a certified letter, admitted into

evidence at trial, that stated that the Halls had complied with the Rule 11 Agreement, that they still had not received the loan modification agreement for the parties to review and execute, and that their prior formal requests for the loan payoff amount and balance had not been answered by BNYM.

Parsons recalled that in late May 2018, BNYM finally sent the loan modification documents but with an inaccurate payoff amount of $48,783.87 and it appeared from the payoff amount that the $19,000-figure payment during the trial period was not being deducted from the new loan amount of $57,000.[3] Parsons testified that the $48,000-figure payoff "didn't make any sense" and in an e-mail on May 30, 2018 to BNYM's counsel, Parsons inquired about the inaccurate payoff amount. Parsons recalled why the $48,000-figure as a payoff amount was inaccurate:

> If we're at 57[,000], to get to the 48[,000-figure], you know, that's 9,000. And [the Halls] were making basically 500-dollar payments a month times five. That's $2[,]500. That's not 9,000. You know, the 19,000 they paid should be included in that; but to get to [the] 48[,000-figure], it just looks like [BNYM is] pulling a number out of the air.

On June 22, 2018, Parsons sent BNYM's counsel the following certified letter:

> We now have received a PAYOFF QUOTE that does not make sense.

---

[3] We note that throughout the trial, the parties often referred to the $57,207.95 new modification loan balance as $57,000 and referred to the $19,244.39 first trial plan payment as $19,000 for ease of reference.

16

The only course I can take at this time is to continue to have my clients make payments under the existing agreement.

Please find enclosed Check No. 3367 in the amount of $582.26 representing the SIXTH payment my clients are making toward the modified loan agreement (MODIFICATION). We have previously agreed that the Promissory Note (Loan #1005471431) will be modified to reflect a balance of $57,207.95.

These six payments, including the one enclosed, will be credited toward that balance of $57,207.95.

Please send an accurate Payoff Quote.

Please call me at your earliest convenience to discuss a resolution to this matter.

Parsons testified that the payoff quoted by BNYM was inconsistent with McCammon's statements under the Rule 11 Agreement that SLS would deduct the $19,000-figure from the $57,000 new loan amount. BNYM's counsel acknowledged in an e-mail response that the payoff amount "was not clear" to BNYM's counsel either. On July 3, 2018, Parsons e-mailed BNYM's counsel stating, "I am not sure why SLS cannot seem to get this loan (account) and modification correct [and] continue[s] to commit errors when applying payments towards this loan." Parsons also noted in the e-mail that the payoff amount did not appear to be accurate based on the Rule 11 Agreement.

Parsons testified that the Halls received the modification agreement documents for them to sign. On July 17, 2018, the Halls executed two original copies of the loan modification agreement and sent them back for the loan modification to

be processed and returned signed by SLS. The loan modification agreement provided in pertinent part that after the trial period payments were timely made by the Halls, the new principal balance on the new loan was $57,000 (after $22,469.22 of the loan had been "forgiven"), the new loan was effective June 1, 2018, and that the Halls were obligated to pay 212 monthly payments of $587.16 (which included escrow payment) beginning July 1, 2018. The loan modification agreement also provided the following:

> The modified Principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges) and deferred principal and another deferred amounts from a prior modification, collectively, "Unpaid Amounts"[] less any amounts paid to the Lender but not previously credited to my Loan and less Principal in the amount of $22,469.22 which has been forgiven.

Parsons testified that the $22,469.22 that had been "forgiven" was a result of what had been uncovered during the discovery process during the first suit when the bank improperly tried to foreclose on the Halls' mortgage and the bank had mistakenly reported in payoff reports that the Halls owed an "impound advance balance" and for "corporate advances" which totaled $22,469.22. According to Parsons, BNYM agreed that those charges "didn't make sense" and that was why BNYM ended up settling the first suit with the Halls. Parsons testified that the language in the modification agreement that the modified principal balance of the note would be "less any amounts paid to the lender but not previously credited to my loan[]" was

18

consistent with his agreement with McCammon in the Rule 11 Agreement that the trial period plan payments of $19,244.39 in February 2018, $582.16 in March 2018, and $582.16 in April 2018 would be credited against the $57,000 new loan amount. According to Parsons, "common sense tells us that [] [w]e're [not] just going to all of a sudden now give the bank an extra 20,000 that we're not going to get credit for[.]" Parsons also testified that the loan modification agreement that he received months after the Rule 11 Agreement had to provide for the new loan amount of $57,000 even though payments by the Halls had been accepted by BNYM because the Rule 11 Agreement terms required the new loan amount to be $57,000 before off-sets.

On July 31, 2018, Parsons received an e-mail from BNYM's counsel stating:

We received the original loan modification agreements that you forwarded. We sent the originals to our client and I was advised that they were received on 7/24 and were being processed. We will send you a fully executed copy as soon as it is available.

According to Parsons, BNYM's counsel confirmed receiving the signed copies of the loan modification, but that the Halls, even at the time of trial, had never received a copy of the modification agreement signed by BNYM.

On August 7, 2018, Parsons sent BNYM's counsel the following e-mail:

Seeing if the modification has been set up in your client's system. We are receiving letters like the one attached. Clearly, this letter was sent in error (with the modification still being processed).

And then this e-mail from Parsons to BNYM's counsel on August 16, 2018:

19

Your client continues to return our payments, which are in compliance with the loan modification agreement previously agreed to by way of the Rule 11 Agreement.
See attached correspondence.

If SLS will not accept the payments, I do not know what else to do.

At this time, we will wait on the signed modification being returned to us by SLS.

On August 24, 2018, Parsons sent BNYM's counsel the following follow-up e-mail:

We are continuing to make payments under the modification agreement per the RULE 11.

The 5th and 7th payment(s) were recently returned to my office by SLS. We are resending these payments. Attached is the September (8th) payment in accordance with the modification agreement.

Please send the signed modification from the mortgage co. once you receive it.

I hope SLS will accept our payment(s) per the prior agreement.

The same day, BNYM's counsel replied:

I've not been advised of any issues by SLS but will reach out to them. The last I heard they had received the original modification agreements and were processing.

I will get more information and be back in touch when I have additional news.

In a September 5, 2018 e-mail admitted at trial, BNYM's counsel informed Parsons that the Halls' payments were being returned because the modification paperwork had not been processed, and BNYM was working to resolve the situation.

In an e-mail from BNYM's counsel to Parsons on September 19, 2018 admitted at trial, BNYM's counsel apologized for "this never[-]ending circle" of the Halls' payments being returned and sent back. According to Parsons, Milliron's statement that the loan modification had not been processed contradicted his prior statement that the loan modification was being processed. Parsons testified that on at least one occasion, SLS stated that the reason the checks were being rejected was because they were "stale-dated" which Parsons explained was "factually inaccurate[]" because the stamps showing SLS's receipts of the checks showed otherwise. Copies of some of the Halls' payments and correspondence from Parsons sent with the payments were admitted into evidence.

Due to the modification of the loan not being booked from the time the Halls executed the loan modification until August of 2021, the Halls' $587.16 monthly payments were being timely paid but some were returned (sometimes multiple times) because the amount being submitted did not match the amount due in BNYM's system.[4] Parsons testified that he and the Halls relied on the representations from BNYM's counsels' e-mails stating that the loan modification documents had been received and the loan modification was being processed, and that based on those representations, the Halls continued to make payments to

---

[4] Ultimately, BNYM forgave the $13,934.60 owed by the Halls under the loan modification agreement during the period of time that the loan was mistakenly not booked.

BNYM. Parsons testified that as of the time of trial, more than four years after he informed BNYM that he would wait on the signed modification to be returned to him, he still had not seen the modification signed by BNYM even though the Rule 11 Agreement required BNYM to execute a loan modification. Parsons recalled that the Halls had been very concerned about their credit because failure to make timely mortgage payments negatively impacts credit scores, and Parsons had communicated their concerns to BNYM.

Parsons testified that he ultimately referred the case in 2018 to the Halls' current counsel because Parsons believed that another lawsuit was inevitable and that it would be in the Halls' best interest for another firm to work on the case. According to Parsons, he was subpoenaed to testify in this case as a fact witness. Parsons testified that he was not aware of any negligence or material breach on the part of the Halls regarding the case, he believed that the Halls handled everything in a reasonable manner, and Parsons was not aware of any non-compliance with the Rule 11 Agreement by the Halls. According to Parsons, BNYM breached the Rule 11 Agreement by not providing an enforceable loan modification because BNYM never signed the loan modification.

**Testimony of Teresa Hall**

Teresa Hall testified that she and David have been married for thirty-two years and that they have lived at their home in Beaumont since 1989. According to Teresa,

22

the value of their home at the time of trial was between $100,000 and $120,000, and she and David have made payments on the home since 1989. Teresa recalled that she and David hired John Pat Parsons in the first suit against BNYM that alleged that BNYM wrongfully tried to foreclose on the Halls' home, and that with Parsons' help, the Halls and BNYM ultimately reached a settlement in the first suit.

Teresa testified that her understanding of the settlement agreement was that the new loan would be for $57,000, she and David were required to make three payments in order to show BNYM that the Halls were capable of paying on time, and that after the payments were made, BNYM would finalize the paperwork on the modification loan. According to Teresa, she understood the three payments would be applied to the $57,000 loan to decrease the amount owed, just like "anytime you pay on a loan[.]" When showed McCammon's December 22, 2017 e-mail to Parsons setting forth the Rule 11 Agreement's terms which included that the Halls' trial plan payments of $19,244.39, $582.16, and $582.16 would be credited to the $57,0000 loan, Teresa agreed that McCammon's statement was consistent with Teresa's understanding of the Rule 11 Agreement. Teresa recalled that after making the third payment, the Halls were supposed to stop making the payments through Parsons' office and BNYM was supposed to send the loan paperwork and then the Halls could make direct payments to BNYM. Teresa testified that some of the payments were cashed by BNYM and some were not, and that when the payments were not cashed

by BNYM, she would be in contact with Parsons' office and was advised that Parsons' office was waiting for BNYM to respond. Teresa testified that she and David signed the loan modification paperwork but that, to her knowledge, BNYM never signed the paperwork. When showed a December 2018 statement from BNYM admitted at trial, Teresa agreed that the statement said that the Halls owed BNYM $52,789.08 past due and that the interest rate on the loan was 10.85 percent, and Teresa testified that both of those numbers were not consistent with the Rule 11 Agreement or the loan modification agreement.

Teresa testified that waiting four years for BNYM to book the loan modification was not a reasonable period of time. Teresa recalled that after she and David promptly signed the loan modification and sent it to BNYM, she never received any notification that the paperwork was incorrectly filled out or that she did not qualify for the loan modification. According to Teresa, she was informed at one point that BNYM had received the loan modification and was working on it, and Teresa relied on that information because she had done everything required. Teresa agreed that the "entire saga" with BNYM has lasted approximately seven years, and that the current lawsuit has lasted four years. According to Teresa, the litigation with BNYM has caused tension in her marriage, she and David no longer sleep in the same room anymore after 32 years of marriage, she has lost sleep, and it is depressing

24

and "heavy" to come home and look at her house with the knowledge that she is still in litigation with BNYM.

According to Teresa, after hearing Parsons' testimony and reviewing the e-mails admitted into evidence, she believed that she and David had complied with the Rule 11 Agreement, it was BNYM's fault, and the current lawsuit resulted from BNYM's failure to comply with the Rule 11 Agreement by not crediting the Halls' payments to the loan. Teresa recalled that the fact that BNYM was not accepting their payments when the Halls and BNYM had an agreement for the loan modification caused her stress and worry, and even when the Halls' payments were cashed, BNYM was not crediting their account and told the Halls that their payments were 30 and 60 days behind. She testified that even in 2021, when she was sending in payments timely by certified mail, some checks would be sporadically returned by BNYM as "stale," despite her always having sufficient funds in her account and not receiving any "NSF" notice from her personal bank indicating otherwise. She testified that when she started sending her checks certified mail to SLS on the advice of her attorney in the current lawsuit, she had to pay extra money to send these payments certified mail instead of how she paid her other bills online. According to Teresa, even when BNYM cashed the payments before the 5th of the month, BNYM was not positively reporting their timely payments to the credit bureau. Teresa

testified that at the time of trial and going back to at least 2017, the only creditor reporting her as "delinquent" was SLS.

Teresa testified that on the Friday before trial, she received a credit "alert" on her phone notifying her that SLS had reported negative activity and that her credit score had decreased by six points. The credit alert showed a graph that showed payments as past due for the prior and current year that were timely paid by the Halls. According to Teresa, since the signing of the Rule 11 Agreement, the adverse reporting by BNYM decreased her credit score. Teresa testified that the August 25, 2022 credit report for David admitted into evidence and published to the jury indicated that the remaining balance on the BNYM loan was $47,000, which she believed to be incorrect because the Halls made payments on the $57,000 loan for four years, including initial payments of roughly $19,000 and at least $587 in monthly payments. Teresa testified that the credit bureau report also had errors in reporting the Halls' mortgage payments for 2021 and 2022.

According to Teresa, she and David had recently visited a car dealership to purchase a vehicle and a salesperson at the dealership initially told them that he believed he could beat the interest rate the Halls' credit union had preapproved them for, but after he ran their credit report, he told them "I can't beat that rate because you have a charge-off." Teresa testified that at the time she did not know what a "charge-off" was, but that now she does because she received a 1099-C from SLS

for approximately $36,000 stating that SLS had discharged $36,000 of the Halls' debt in 2021. The 1099-C from SLS was admitted into evidence, and Teresa recalled that the charge-off by SLS years after the Halls filed their lawsuit against BNYM and after BNYM failed to comply with the settlement agreement ultimately had a negative impact on the Halls' ability to get a better interest rate on the car loan at the dealership, and the Halls suffered embarrassment there. Teresa agreed on cross-examination that the loan modification paperwork stated that the modification could result in tax consequences, but she testified that she expected to receive a 1099-C for $22,000 in 2018 instead of $36,000 in 2021.

Teresa recalled how she has lost sleep at night because of her dealings with SLS and the negative reporting to the credit bureau. She also testified as follows as to the angst that the situation caused her:

> I never know from one day to the next if I'm going to get served with papers saying [] you've got 24 hours to get out because [] they don't have the payments even though they've cashed the checks. So it's like just constantly hanging over your head.

Notices from SLS on the Halls' front door and porch regarding home inspections and about the home being "abandoned" were admitted into evidence. Teresa testified that such notices were retrieved from her door in 2018 and 2019 despite having reached a settlement with BNYM in 2017 and after she had believed that the litigation would end. According to Teresa, these notices posted at her home could be observed from the road and one of her neighbors asked if the Halls were "fixing

to have to move[,]" which embarrassed Teresa. Teresa testified that at the time of trial she had nothing hanging on the walls of her home because "if they serve me with a notice to vacate, I've got to be able to move quick. You only get 24 hours. I can't pack up a lot of stuff in 24 hours."

On cross-examination, Teresa agreed that she originally signed a note for her home equity loan with New Century Mortgage Corporation in December of 2000 with an interest rate of 10.85 percent that was added to their original mortgage on their home. Teresa agreed that prior to the transfer of the home equity loan to BNYM, Countrywide Mortgage had serviced the loan. According to Teresa, the Halls had problems with Countrywide Mortgage, and Countrywide Mortgage had reported the Halls were in default. Teresa agreed that, as of the time of trial, the loan modification with BNYM was in effect and the Halls' home had not been foreclosed upon. According to Teresa, she and David had a tax lien reported on the credit report, and they also had multiple hard inquiries to the credit including four hard inquires within a three-day span in 2020. Teresa agreed that both the tax lien and the numerous hard inquiries to credit could have negatively impacted their credit scores. On re-direct, Teresa clarified that her credit report noted that no liens were on her credit file.

**Testimony of Dominique Varner**

Dominique Varner, a law partner in the "default servicing" section of the Hughes Watters law firm representing mortgage lenders, was subpoenaed to testify as a corporate representative of the law firm. Varner testified that Jennifer McCammon and Nathan Milliron, the lawyers with Hughes Watters corresponding with Parsons, were no longer employed at Hughes Watters. According to Varner, her firm did not represent SLS or BNYM in this lawsuit but it represents SLS, BNYM's servicing agent, in other cases. According to Varner, SLS, as a servicing agent for BNYM, services BNYM's loans and binds BNYM.

Varner testified regarding an e-mail dated August 29, 2018, and the e-mail was admitted as an exhibit at trial. The e-mail was from Nathan Milliron, an attorney with Hughes Watters at the time, to a representative of SLS. In the e-mail, Milliron asked for a fully-executed copy of the loan modification agreement and stated the Halls' counsel had indicated that SLS had returned three of the Halls' payments, that Parsons had provided the returned checks to Milliron, and Milliron was sending them a second time to SLS for processing. In another e-mail admitted at trial, the SLS representative responded on September 5, 2018 that she was "trying to get to the bottom of what happened[,]" that "[t]he original modification documents were sent to [SLS's] modification team who is now claiming they didn't receive them[,]" and that "[t]he checks were returned based on the lack of modifications being

29

received by [SLS's] modification team." Varner testified that her understanding of the situation was that SLS would not apply the payments unless they had the fully executed modification agreement booked into their system, and Varner agreed that booking the loan into SLS's system would not have been the Halls' responsibility. Varner acknowledged that despite the fact that BNYM's counsel asked for a fully executed copy of the loan modification agreement four years prior to trial, as of the time of trial Varner had not seen a fully executed copy. It was Varner's understanding that the loan modification was not booked until August of 2021. Varner also agreed that the e-mails admitted at trial between BNYM's counsel and Parsons portray a "never-ending circle," that some of the Halls' payments were being sent by Parsons, returned by SLS to Parsons, sent to Hughes Watters who then sent the payments to SLS, returned again to Parsons, Parsons resent them to Hughes Watters, and then Hughes Watters would resend them back to SLS. Varner testified that based on the e-mails admitted at trial alone, there appeared to be a lack of full communication between Hughes Watters and BNYM. According to Varner, she has never communicated with McCammon or Milliron about any communications other than what is contained in the e-mails admitted at trial.

Varner testified that this is the first time she has ever been involved in a lawsuit over the breach of a Rule 11 agreement despite having entered into hundreds of Rule 11 agreements during her career. According to Varner, McCammon drafted

the Rule 11 Agreement on Hughes Watters letterhead on December 22, 2017, the same day McCammon sent the e-mail stating that she had consulted with SLS in modifying the loan terms to a debt owed of $57,000 at four percent interest, with the Halls making initial timely payments of $19,244.39, 582.16, and 582.16, which would be "credited toward the debt owed above." Varner testified that she believed the e-mail was "just a proposal[,]" that a Rule 11 agreement is not a final agreement, a party can sue for breach of contract for a violation of a Rule 11 agreement if that is the only agreement, and that in this case there was "[a] complete modification[]" that SLS was performing under at the time of trial. Varner further testified that she believed that BNYM and the Halls should be bound by their Rule 11 Agreement, and that Varner believed the Halls had complied with the Rule 11 Agreement, and that she had not seen anything that suggested otherwise. According to Varner, the Halls submitted the first three payments on time and for the right amounts. Varner testified that in Texas for a Rule 11 agreement to be binding it must be signed by both parties; that the Rule 11 Agreement was signed by both parties here; and that if either party had not signed the agreement, it would not have been enforceable against that party. Varner testified that the Rule 11 Agreement imposed obligations on the Halls, which they complied with, and it imposed obligations on BNYM but BNYM made a mistake in not booking the loan when it should have been booked. Varner testified that Parsons was sending BNYM e-mails regularly and following up about

the Halls' payments being returned and the booking of the loan modification. Varner acknowledged that SLS lost the original loan modification documents, she never saw a loan modification signed by SLS, and she did not know if SLS ever signed the loan modification. Varner was aware that the loan modification was not booked until after the Halls filed this lawsuit, but that "booking the loan modification is effectively putting it into practice[]" and that the Halls "got everything and then some from that agreement[.]" When asked if she had seen SLS statements admitted into evidence from November of 2018 (almost four months after the Halls signed the modification agreement providing for a four percent interest rate) that showed the interest rate on the Halls' loan at 10.85 percent, she answered that the Halls were still being charged the 10.85 percent interest because the loan modification "hadn't been booked by then[]" because BNYM lost it. According to Varner, either BNYM booked the copy of the loan modification or found the original, but she did not know which. Varner admitted that during her prior deposition she testified that she could not explain why BNYM did not comply with the Rule 11 Agreement. According to Varner, it was reasonable for Parsons to rely on Milliron's August 7, 2018 e-mail to Parsons stating that the loan modification was being processed, and that SLS told Hughes Watters that the loan modification was being processed, and Hughes Watters passed that information on to Parsons. Varner agreed that when she signs a Rule 11 agreement, she expects it to be enforced.

Varner testified that she believed that based on the e-mails admitted at trial between Milliron and Parsons that they both were frustrated, that the loan modification had not been processed, and that the Halls' payments were not being processed. According to Varner, the Halls were reported to credit agencies because BNYM had not processed some of the Halls' payments after the Rule 11 Agreement in December 2017, despite the Halls' compliance with the agreement. Varner testified that she did not think the fact that SLS kept returning the Halls' checks hurt their credit "any more than it was already dinged." Varner agreed that SLS was still making inquiries of the Halls' credit even in the months leading up to trial, but she explained that the Halls' credit report reflects that some of the Halls' other lenders were doing the same. Varner acknowledged that the Halls were not at fault for the "never ending circle[,]" and that it could be BNYM or SLS that is at fault or "someone in between." Varner testified that she was not aware of anything that Parsons did wrong in his representation of the Halls, and Varner was not aware of any internal investigation to try to find out why the Halls' payments were being returned despite being timely sent.

According to Varner, the language of the Rule 11 Agreement states in the first line that the agreement would result in a loan modification which would be a lot more detailed than what the agreement said, and that the agreement was only a basic outline with more settlement documents to follow. The loan modification would set

out the actual terms of the modification going forward including repayment terms, interest, the security agreement, and the consequences of defaulting on the loan. Varner testified that a trial period plan is a "temporary probationary period[]" and that if the Halls made the payments pursuant to the probationary period, then the loan modification would be booked, and the loan modification would not be created until after the last payment was made under the temporary probationary period. Varner noted that the Rule 11 Agreement did not say how the three trial period payments were to be applied.

When shown Exhibit 9, the e-mails admitted at trial from December 18, 2017 between Parsons and McCammon three days before the Rule 11 Agreement was signed, Varner agreed that the e-mails discussed that the $57,000 debt owed on the loan would be reduced by the Halls' first three payments of roughly $19,000, $582, and $582, and that at no time that day did McCammon state in an e-mail that her client was not agreeing those payments would reduce the loan amount of approximately $57,000. Varner acknowledged that on the day that McCammon drafted the Rule 11 Agreement, she stated in her e-mail to Parsons that the three payments would be credited toward the $57,000 debt owed, but Varner suspected that McCammon could not get approval for that term from SLS. Varner agreed that in McCammon's e-mail the same day that she drafted the Rule 11 Agreement that she stated that the terms would include that the three payments would be credited to

the $57,000 total debt owed, and that she followed up telling Parsons "Great news" and that she was drafting settlement documents. Varner testified it was her belief that McCammon later could not get approval from SLS to reduce the $57,000 by the amounts of the three payments and that was why the Rule 11 Agreement did not include the same specific language as in her prior e-mail that said the three payments would be credited to the loan amount.

According to Varner, she never saw e-mails where Parsons told McCammon that the Rule 11 terms were incorrect, and to Varner's knowledge Parsons never marked up the Rule 11 Agreement and sent it back to McCammon. Varner acknowledged that the Rule 11 Agreement was signed by the parties, the Rule 11 Agreement was filed with the court as evidenced by the file-stamp, and that the Rule 11 Agreement is binding under the Texas Rules of Civil Procedure.

Varner agreed that she had seen Parsons' e-mail to Hughes Watters with his handwritten revisions to the release clarifying that the $57,000 new loan balance would be reduced by the three trial payments, and that she was unaware of any response by Hughes Watters, SLS, or BNYM to those handwritten notations suggesting that the handwritten terms were inconsistent with their agreement. Varner testified that the loan modification did not provide that the three trial period payments would be applied to or deducted from the new principal loan balance of $57,000, and that on the loan modification's effective date of June 1, 2018, the loan

modification became the "governing document[]" and "contemplates those payments having already been made."

Varner recalled that on top of the $22,000 of the debt that BNYM "forgave," it also waived the payments for all of the checks sent by the Halls but that were returned. Varner explained that after the Halls signed the loan modification, BNYM never foreclosed on the home equity loan.

**Testimony of Nicholas Raab**

Nicholas Raab, an assistant vice-president of SLS, testified as SLS's corporate representative. Raab testified when the Halls took out the original loan for $44,800, SLS was not the loan servicer. According to Raab, when SLS began servicing the original loan in December of 2011, the original loan was four months' delinquent. Raab testified that SLS did not refer the original loan to foreclosure for almost three years. At the mediation in this case, Parsons raised an issue that the Halls had made a substantial payment towards the loan in June of 2011 that included a "substantial overage of the amount due to bring the loan current[]" in the amount of a little less than $19,000 but the prior servicer posted that money to the principal and then "inexplicably" reversed and voided that payment and returned the money to the Halls in August of 2011. According to Raab, for some reason, that check was never negotiated, and the money was turned over to the State as unclaimed funds. When SLS learned of this at the mediation, and the Halls were in the process of getting that

money from the State of Texas, the parties tried to negotiate after the mediation to "get [the Halls] back on track[]" and that the $19,000 payment was contemplated in the first payment of the trial modification to allow the Halls to get that money back credited to the loan. As for the discussion about the "credit reporting letter" during the negotiating of the Rule 11 Agreement, Raab testified that SLS would not agree to provide a credit reporting letter because SLS had not been the prior loan servicer and could not control what that prior loan servicer reported prior to December of 2011 and SLS could not report on behalf of another loan servicer.

Raab explained that a trial plan always precedes a permanent modification and gives the borrower a chance to continue making payments, a trial plan puts the foreclosure on hold, and a trial plan outlines how the trial plan payments will be applied because "it is not yet a permanent and formal modification." According to Raab, typically after all trial plan payments are made and the parties fully execute a modification agreement detailing the terms of the modified loan, any difference in the amount the trial period payments and the regular monthly mortgage payments will be added to the balance of the loan along with any past due amounts. Raab testified that, as of the time of trial, the Halls had paid approximately $77,000 on a $44,000 loan and that they owed approximately $47,000 more.

Raab testified that the Rule 11 Agreement did not say that the Halls' loan was automatically modified or that all the Halls needed to do was to complete trial

37

payments for the loan to be automatically modified. According to Raab, when the Rule 11 Agreement was entered into, a modification agreement did not exist and that after the completion of the successful trial period, SLS would then have to run figures to formulate a final modification and send the documents to the Halls to execute and then start making payments on the permanent agreement. In essence, SLS saw the purpose of the Rule 11 Agreement as "to hammer out the kind of key terms of what was discussed in a mediation[,]" but "[b]y necessity" some of the terms would change slightly because interest is accruing daily. Raab testified that although the Rule 11 Agreement set forth the trial plan payments, the agreement did not address when the Halls would make a modification agreement payment, how the trial period plan works, when the loan is going to be modified, what happens if the Halls failed to make the trial plan payments, when the loan was going to be modified, and where the Halls were supposed to send their payments.

Raab explained that he did not have anything to do with the effort to get the Halls' loan modification booked, nor did he personally handle their loan. Raab could not name any employee at SLS who worked on the loan, except for one employee who was involved in the e-mail correspondence, but she no longer worked for SLS. That employee was not the only employee who worked on the loan due to the variety of departments that handle a loan at SLS, and Raab did not try to contact her or anyone else after the fact to see if they knew what happened with the loan. According

to Raab, SLS made a "major mistake" in losing the Hall's original loan modification documents, missed opportunities to fix the loss of the documents, and had "breakdowns" in communication with its lawyers. Raab also blamed Parsons for taking two months to have the Halls review and sign the loan modification documents and stated that this two-month delay was a "contributing factor[]" to SLS losing the original loan modification documents. Raab testified that because the effective date of the loan modification was June 1, 2018, the cover letter attached to the originals sent to Parsons requested that the signed original loan modification documents be returned by June 25, 2018, and that "[w]hen a modification shows up late past deadlines, it's likely to be rejected for failure to deliver timely." However, Raab was not aware of any communication sent from SLS's counsel to Parsons stating that the timing of the returning of the loan modification documents caused any problem, Raab acknowledged he could not point to any facts supporting his opinion that the Halls' month or two delay in sending the signed documents contributed to the loan modification not being booked, and he agreed that the loan modification was booked three years later. Raab agreed that based on his knowledge of the facts, SLS never informed the Halls that SLS was not satisfied with the timeliness of the Halls' submission of the documents, nor did SLS tell the Halls that SLS lost the documents. Raab agreed that he was speculating that the reason the loan modification was not booked was because it was delivered after the deadline and

39

then "subsequently lost because it was not going to be honored[,]" and he admitted that the only person at SLS that he knew actually handled the loan was Anne Stenstrom, whom Raab never talked to about the loan. Raab stated that the Halls were not at fault for the communication breakdown between Parsons and SLS's counsel.

Raab testified that as for the $19,000 figure that the Halls paid during the trial plan as one of the three payments, the money was posted to the original loan's contractual terms which had a 10.85 percent interest rate, and the payment advanced the account's due date from August of 2011 to sometime in 2013. Raab testified that the total debt on the loan as of December 11, 2017 was approximately $96,000, and that the trial period payments were applied to that amount. Raab agreed that it was never discussed in the e-mails from SLS's counsel to Parsons that the $19,000 would not be applied to the $57,000 balance. According to Raab, SLS and the prior loan servicer had paid the taxes and insurance for the three years before the modification agreement because the loan had been in default.

Raab agreed that Exhibit 4 was comprised of e-mails between Hughes Watters counsel for SLS and SLS, and those e-mails were admitted into evidence. The exhibit reflects that on August 29, 2018, Milliron (SLS's counsel) sent the following e-mail to Anne Stenstrom, an employee of SLS:

Anne:

Can you provide a fully executed copy of the loan modification agreement that was previously supplied?

In addition, opposing counsel has forwarded three separate checks to us (he claims they were sent to SLS and were returned) as follows:

(1) 7/3/2018 check number 3379 in the amount of $587.16;

(2) 7/17/2018 check number 1210 in the amount of $587.16; and

(3) 8/23/2018 check number 1217 in the amount of $587.16.

I am going to mail all of these to your attention today.

On September 5, 2018, Anne sent an e-mail response to Milliron:

Hi Nathan,

I'm trying to get to the bottom of what happened. The original modification documents were sent to our modification team who is now claiming they didn't receive them. The checks were returned based on the lack of modifications being received by our modification team. I'm working to find out if the copies I made before handing them over will suffice. The checks that you are sending me – are these the same that were returned?

On September 10, 2018, Milliron sent Stenstrom this e-mail:

Anne:

Any update as to the status of the loan modification?

And then Milliron sent another e-mail to Stenstrom on September 24, 2018:

Anne:

Today, I received the following checks back from opposing counsel:

Check 1210, dated 7/17/2018 in the amount of $587.16;

Check 1217, dated 8/23/2018 in the amount of $587.16;

Check 3379, dated 7/3/2018 in the amount of $587.16; and

Please let me know if you'd like me to send the checks to your attention or, if you'd like me to hold them until the issues with the modification get ironed out so they don't get sent back again.

I will await instructions from you before sending.

Raab agreed that these e-mails reflect that almost four years ago, SLS's counsel

asked SLS for a fully executed copy of the loan modification and that after SLS did

41

not respond for eleven or twelve days, SLS's counsel again asked for an update. Raab acknowledged that the e-mails also indicate that three of the Halls' monthly payments under the loan modification were returned by SLS, sent to SLS's counsel, who sent the checks back to SLS, the checks were returned again by SLS, sent back to SLS's counsel, who them sent the checks back to SLS, and that these were the same checks that were "going around in a circle" between the parties' lawyers and SLS. Raab testified that this occurred because the loan modification documents were not returned by the June 25, 2018 deadline, the loan modification documents were received later but lost "somewhere between Ms. Stenstrom and the loss mitigation department[,]" and the loan modification was not booked until later. Raab explained that until the loan modification is booked, the loan continues to operate in the system based on the original loan agreement terms, and that until that modification is booked, any check that comes in is viewed by the cashiering department as an insufficient payment and rejected. Raab stated that there was a breakdown in communication between Milliron and Stenstrom because there was an opportunity for Stenstrom to tell Milliron that the documents were lost and that they should have the Halls re-execute the loan modification. Raab testified that he was not aware of a report from any investigation into how the two original loan modifications were lost, but that Stenstrom received the loan modification documents which was an "irregularity" because she was an analyst that received them instead of SLS's

42

business unit that handles those documents. Raab assumed from his review of the e-mails that Stenstrom requested a review to the loss mitigation department at SLS about the missing loan modification documents and learned that the documents were not received by that department. Raab testified that it is SLS's policy that a loan modification cannot be booked without the original, but that "an exception" was made in August of 2021 when the SLS's legal department got involved, and SLS made the decision to book the loan modification without the original documents because it would "be a disservice to [the Halls] not to book it." The exception existed back in July 2018 when the documents were lost, but according to Raab, the exception was not executed until August of 2021 when "litigation proceeded [and] there was a deeper dive into the file . . . and it was concluded that the best thing to do for the Halls was to book the mod[ification] at the original terms offered[.]" According to Raab, when the modification was booked in August of 2021, SLS used the payments from the Halls during the 35-month gap when the modification was not booked that were put into suspense, and then SLS waived the other $13,934.60 for amounts owed during the gap to bring the Halls "current effective September 1st, 2021." At the time of trial, the interest rate on the loan had since been calculated as if it had been four percent back to June 1, 2018. Raab testified that SLS did not notify the Halls or their attorney directly that this would result in a "debt forgiveness" amount of $38,524.73 (that included the roughly $22,000 forgiven through the loan

43

modification and the roughly $14,000 for the Halls' payments that were refused and returned) and that the $38,524.73 would be treated as income for tax purposes, but he testified that a May 10, 2018 letter to the Halls advised them that the modification could result in forgiven debt and tax consequences. The Halls received a 1099-C as a result of the modification because SLS was obligated to report the debt forgiveness to the IRS. Raab acknowledged that the $22,000 that was forgiven was an offset that represented an amount that the Halls allegedly owed when the foreclosure was initiated, and the Halls disputed this amount when they filed the first lawsuit prior to the Rule 11 Agreement. According to Raab, the principal debt forgiveness amount increased to $22,469.22 from the time of the Rule 11 Agreement until the modification because of passage of time, interest accruals, and advances. Raab testified that after the loan modification was booked in August of 2021, the Halls were still making payments in the amount stated on the modification agreement instead of the new higher payment due to the escrow increase and so they were in "rolling default[.]" But SLS retroactively reported "no data" to the credit bureaus, which is a neutral report for the time the loan modification agreement was received by SLS but not booked, and the account was reported as current at the time of the booking of the loan modification "[]as sort of a courtesy to afford the Halls time to catch up[.]"

Raab testified that the e-mails admitted at trial reflect that BNYM's lawyers had represented to Parsons that the loan modification documents were being processed, and that in September of 2018, almost four years prior to trial, BNYM told Parsons that it was trying to resolve the situation and mentioned nothing about the documents arriving late. According to Raab, as early as September of 2018, at least some employees at SLS were aware that SLS had lost the Halls' loan modification documents. Raab agreed that during his deposition he had testified that the reason SLS did not book the loan modification was because SLS had not countersigned, but he testified that there is no requirement that SLS sign the modification for it to be effective and that the making of the loan modification offer to the borrower and the borrower's execution of the agreement creates the contract. SLS's normal policy for handling modification agreements when they are sent in by borrowers is that SLS's mail room identifies the modification agreements, delivers them directly to the cashiering department to process the check that typically accompanies the modification, then the loss mitigation group is informed that the modification agreements have been received so that someone in the loss mitigation group can sign it, which is witnessed by a notary, and then the modification is sent to be incorporated into the original loan document filed. According to Raab, some other jurisdictions require a fully-executed modification agreement to be recorded and that there is a signature line on the modification for the lender to sign as a

counter-fraud measure in jurisdictions where BNYM would record a modification to confirm the parties and have it notarized and sent in for recording. Raab testified that at some point the decision was made at SLS to proceed and book the modification without the original documents because "it was the right thing to do for the Halls."

As for credit reporting, SLS's standard procedure if the account in SLS's system is noted to be in default is to report the account to credit companies as in default. Raab testified that, during the time that the Halls were making their trial plan payments, SLS reported to credit companies that the Halls' loan was "in default but with a trial plan in place[,]" and that the Halls were reported in default until the modification was booked which brought the Halls' credit scores down. According to Raab, typically it is SLS's policy that the modification cannot be booked until BNYM countersigns the document but that legally in Texas the countersignature is not required for the modification to be effective. In the sixteen years that Raab has worked at SLS, this was the first time he had seen this type of situation where a loan modification was booked without it being countersigned. Raab agreed that during his deposition four months prior to trial he testified that he was not aware of any policy at SLS that permitted a binding agreement with SLS to exist without SLS's signature and that during his deposition he never mentioned that the purpose of

SLS's signature line on the modification agreement is only for a counter-fraud measure.

According to Raab, the notices and door hangers placed on the Halls' door by local vendors that SLS contracts with to do routine property inspections were most likely placed there because SLS had the Halls' status as being in default.

Raab believed BNYM and the Halls should be bound by the Rule 11 Agreement, the Halls complied with the agreement and did nothing wrong, and SLS made mistakes. Raab testified that even though the Halls were making payments in the amounts of the coupons provided by BNYM, the Halls were in default because the amounts were less than required under the original loan that was on the books until the loan modification was booked. BNYM had not initiated any foreclosure proceedings against the Halls since the signing of the Rule 11 Agreement. Raab believed that the Halls have had no financial losses resulting from their claims and that they actually financially benefitted from the modification agreement. According to Raab, BNYM did not breach the Rule 11 Agreement, but instead complied with the terms and made an error in booking the modification years later. Raab testified that SLS honored the terms of the agreement, made up for the gap in time and delay SLS caused and fixed the mistake. Raab agreed that BNYM's pleadings in this case reflect that BNYM is seeking attorney's fees from the Halls in this lawsuit.

**Testimony of David Hall**

David testified that he has been a police officer for forty-two years and that he had to return to being a police officer after retiring because of the stress at home and Teresa asked him to go back to work. According to David, when he bought a new Tahoe in 2021, the interest went from 3.79 percent on his prior vehicle to 5.9 percent which increased his payment due to BNYM's negative credit reporting.

David recalled that BNYM's failure to do what the Rule 11 Agreement required has caused a lot of stress between him and Teresa:

> When I come home, it's not a home. It's a house. There's nothing on the walls. My wife has packed everything, being afraid that we might get evicted. So it's just a lot of pressure.
> . . .
> Nothing's in my attic. It was full. Now we have to rent three storage bins. You collect a lot of stuff after 32 years.
> . . .
> [I]t's not a happy home anymore.

David was given a minute to compose himself after this part of his testimony and he then testified to how BNYM's actions embarrassed him:

> It's very embarrassing when we were getting notices on our door. I've lived there a long time. My neighbor apparently caught one of the people putting a notice on my door from SLS. And so he kind of approached me, wondering, "Hey, are y'all getting evicted? Do you need some help?"
> You know, that's embarrassing. I mean, I work a lot. So, you know, it just - - it's nice to have neighbors like that; but you don't want them . . . thinking that you're going to not be living there anymore. . . . [I]t's very embarrassing.

According to David, he feels these actions by BNYM have attacked his credibility within the community, and that BNYM's ongoing litigation has interfered with his daily activities. David testified that because of the ongoing litigation he gets less sleep and he and his wife sleep in separate rooms. David recalled that the only SLS statement that he received that was accurate was from October of 2021, and that the prior statements continued to list the charged interest rate at 10.85 percent instead of four. He testified that since at least December of 2021, he has had a payment returned as deficient even though he was sending in the payment he had been directed to pay, and they did not tell him it was the wrong amount.

On cross-examination, David agreed that during his deposition in April of 2022 that he did not mention the higher interest rate charged on his vehicle but that he indicated the damages he was seeking because of BNYM's actions were for his attorney's fees and due to banks charging him higher interest rates for Teresa's vehicle in 2014. David agreed that since December of 2017 no one involved in this case has attempted to foreclose on his home.

David testified that it was not until Raab's testimony that David was aware that SLS had agreed that SLS breached the Rule 11 Agreement and that the Halls and their counsel did not breach the Rule 11 Agreement. David felt that it was unreasonable that it took BNYM three years to do something they could have done back in July 2018. Before the Rule 11 Agreement the principal balance on the loan

49

was approximately $96,000. According to David, the Rule 11 Agreement and the e-mails admitted at trial state that the $19,000 figure and the two payments of $582 were going to applied to the $57,000 figure and not the $96,000. David testified that BNYM never explained where the $22,000 figure came from and that the loan modification agreement states that there is a $22,000 figure that would be taken off the debt. David agreed that BNYM's math did not make sense because if the principal amount owed was $96,000 and if it was reduced by the trial plan payments of $19,244.39, $582.16, and $582.16, and then reduced by $22,469.22, the result still would not be $57,000 but instead it would be $53,122.07. David agreed that BNYM also never paid the Halls the $1,250 required in the Rule 11 Agreement, and that despite the Rule 11 Agreement stating that taxes and insurance would be escrowed, Raab testified that the $19,000 figure was going to pay taxes and insurance and escrow. As for BNYM's credit reporting that BNYM stated in the Rule 11 Agreement would comply with BNYM's standard procedures, David testified that in 2022 BNYM reported the Halls delinquent in January and March, but not in February, April, May, and June. It did not make sense to David that BNYM was reporting the Halls delinquent at any time because all those months they were timely sending in the amount due as told to them by BNYM, along with payment coupons that had been provided by BNYM.

50

**The Jury's Verdict, Final Judgment, and Post-Trial Motions**

The jury answered the charge as follows:

QUESTION NO. 1:
Did [BNYM] fail to comply with the Rule 11 Agreement?
Answer "Yes" or "No".
ANSWER: Yes

If you have answered "Yes" to Question No. 1, then answer the following Question. Otherwise, do not answer Question No. 2, and skip to Question No. 3.
QUESTION NO. 2:
What sum of money, if any, if paid now in cash, would fairly and reasonably compensate David Hall and Teresa Hall for their damages, if any, that resulted from the failure to comply with the Rule 11 Agreement.

Consider the following elements of damages, if any, and none other:

The difference, if any, between the value of the Rule 11 Agreement agreed to by the parties and the value, if any, that was provided by [BNYM].

Do not include in your answer any amount that you find David Hall and Teresa Hall could have avoided by the exercise of reasonable care.

If answering this question about damages, answer each question separately. Do not increase or reduce the amount in this answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any.
ANSWER: $60,000.00

QUESTION NO. 3:
Did [BNYM], or its agents, make any deceptive or misleading representations that caused damages to David Hall and Teresa Hall?

51

Unfair methods do not include any conduct that resulted from good faith or bona fide error, notwithstanding the use of reasonable procedures to avoid errors.

Answer "Yes" or "No" as to each subpart.

"DECEPTIVE, OR MISLEADING REPRESENTATION" means any one or more of the following:

A.  Misrepresenting the character, extent, or amount of a consumer debt.

ANSWER: <u>Yes</u>

B.  Representing falsely the status or nature of the services rendered by [BNYM] or [BNYM]'s business.

ANSWER: <u>Yes</u>

If you answered "Yes" to any part of Question No. 3, then answer the following Question. Otherwise, do not answer Question[] No. 4 and skip to Question No. 5.

QUESTION NO. 4:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate David Hall and Teresa Hall for their damages, if any, that were caused by the deceptive or misleading representations?

In answering this question about damages, answer each question separately. Do not increase or reduce the amount in this answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1.  The difference, if any, in the value of the Agreement as it was received and the value it would have had if it had been as represented.

ANSWER: $<u>45,000.00</u>

2.  Damage to David Hall and Teresa Hall's credit reputation sustained in the past.

ANSWER: $<u>90,000.00</u>

3.  Damage to David Hall and Teresa Hall's credit reputation that, in reasonable probability, they will sustain in the future.

ANSWER: $<u>250,000.00</u>

4.  David Hall and Teresa Hall's mental anguish sustained in the past.

52

ANSWER: $500,000.00

5.    David Hall and Teresa Hall's mental anguish that, in reasonable probability, they will sustain in the future.
ANSWER: $200,000.00

QUESTION NO. 5:

Did [BNYM] make a negligent misrepresentation on which Plaintiffs justifiably relied to their detriment?

Negligent misrepresentation occurs when –

a.    A party makes a representation in the course of its business in a transaction in which he has a pecuniary interest,

b.    the representation supplies false information for the guidance of others in their business, and

c.    the party making the representation did not exercise reasonable care or competence in obtaining or communicating the information[.]

Answer "Yes" or "No".
ANSWER: Yes

If you answered "Yes" to Question No. 5, then answer the following Question. Otherwise, do not answer Question No. 6, and skip to Question No. 7.

QUESTION NO. 6:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate David Hall and Teresa Hall for their damages, if any, that were proximately caused by such negligent representation?

"PROXIMATE CAUSE" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

In answering this question about damages, answer each question separately. Do not increase or reduce the amount in this answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Consider the elements of damages

53

listed below and none other. Do not include any amount for interest on past damages, if any.

Economic damages for negligent misrepresentation are limited to those necessary to compensate the party for the pecuniary loss caused by the misrepresentation. Benefit-of-the-bargain and lost-profit damages are not available.

Answer separately in dollars and cents for damages, if any.

1. The economic loss, if any, otherwise suffered in the past as a consequence of David Hall and Teresa Hall's reliance on the misrepresentation.

ANSWER: $15,000.00

2. The economic loss, if any, that in reasonable probability will be sustained in the future as a consequence of David Hall and Teresa Hall's reliance on the misrepresentation.

ANSWER: $85,000.00

If you answered "Yes" to Question No. 1 <u>or</u> any part of Question No. 4 then answer the following Question. Otherwise, do not answer Question No. 7.

<u>QUESTION NO. 7:</u>

What is a reasonable fee for the necessary services of David Hall and Teresa Hall's attorneys in this case, stated in dollars and cents?

Do not include fees that relate solely to any other claim, other than what was presented in Question No. 1 or Question No. 4, and do not include fees related solely to Hughes Watters Askanase, LLP or Jennifer M. McCammon.

Answer with an amount for each of the following:

A. For representation in the trial court

ANSWER: $135,146.15

B. For representation through appeal to the court of appeals.

ANSWER: $95,000.00

C. For representation at the petition for review stage in the Supreme Court of Texas.

ANSWER: $15,000.00

D. For representation at the merits briefing stage in the Supreme Court of Texas.

ANSWER: $10,000.00

E. For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

54

ANSWER: <u>$10,000.00</u>

On September 27, 2022, the Halls filed Plaintiffs' Motion for Entry of Judgment and elected to recover only on their theories of violations of the TDCA and negligent misrepresentation.

The trial court signed its Final Judgment on January 24, 2023:

> BE IT REMEMBERED that on the 29th day of August, 2022, . . . the above-entitled and numbered cause came on to be heard. . . . [O]n September 2, 2022, the evidence on behalf of all parties having being concluded, all parties rested their case. . . . [T]he case was submitted to the Jury, who . . . reached its verdict herein . . . , and the same was duly received and accepted by the Court and this Court having accepted such verdict, read the jury's verdict in open Court and the verdict was 12-0.
>
> The Court's Charge, including the Questions submitted to the Jury and the Jury's verdict thereto, being filed among the papers of this cause, are incorporated herein by reference for all purposes.
>
> The Jury found that Plaintiffs, David Hall and Teresa Hall, suffered money damages in the sum of One Million Two Hundred Nineteen Thousand Two Hundred Seventy-four and 08/100 ($1,219,274.08) Dollars. These damages are comprised of $44,127.93[5] for the difference in the value of the Agreement as it was received and the value it would have been as represented; $90,000 for damage to David Hall and Teresa Hall's credit reputation sustained in the past; $250,000 for damage to David Hall and Teresa Hall's credit reputation that, in reasonable probability, they will sustain in the future; $500,000 for David Hall and Teresa Hall's mental anguish sustained in the past; $200,000 for David Hall and Teresa Hall's mental anguish that, in reasonable probability, they will sustain in the future; and $135,146.15 in attorney's fees for representation in the trial court.
>
> Plaintiffs are entitled to prejudgment interest on $44,127.93 for the difference in the value of the Agreement as it was received and the

---

[5] Footnote 1 to this amount in the Final Judgment explained, "Plaintiffs remit from the $45,000 awarded by the jury because the jury awarded more than Plaintiffs requested.

55

value it would have been as represented; $90,000 for damage to David Hall and Teresa Hall's credit reputation sustained in the past; $500,000 for David Hall and Teresa Hall's mental anguish sustained in the past; and $135,146.15 in attorney's fees for representation in the trial court. The prejudgment interest rate is 5.5%. It is calculated from September 30, 2019 to January 18, 2023 for a total of $139,797.12.

The jury also found that Plaintiffs, David Hall and Teresa Hall, are entitled to contingent attorney's fees in the amount of $95,000 for representation through the court of appeals; $15,000 for representation at the petition for review stage in the Supreme Court of Texas; $10,000 for representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

It is, therefore, ORDERED, ADJUDGED and DECREED by the Court that Plaintiffs [] have and recover from the Defendant [BNYM] the sum of One Million Two Hundred Nineteen Thousand Two Hundred Seventy-four and 08/100 ($1,219,274.08) Dollars, plus prejudgment interest from September 30, 2019 to January 18, 2023 in the amount of One Hundred Thirty-nine Thousand Seven Hundred Ninety-seven and 12/100 ($139,797.12) Dollars, for total Judgment in the sum of One Million Three Hundred Fifty-nine Thousand Seventy-one and 65/100 ($1,359,071.20) Dollars, with postjudgment interest at the legal rate from entry of this judgment until paid.

It is further, ORDERED, ADJUDGED and DECREED by the Court that taxable costs of court herein in the sum of Five Thousand Two Hundred and Sixty-eight and 14/100 ($5,268.14) Dollars for filing fees of $274.72, service of process fee of $337.92, deposition of costs of $4,665.50, plus any and all other taxable costs of court not listed above, are taxed against Defendant.

It is therefore, ORDERED, ADJUDGED and DECREED by the Court that Plaintiffs [] have and recover from the Defendant [BNYM] contingent attorney's fees in the amount of $95,000 for representation through the court of appeals; $15,000 for representation at the petition for review stage in the Supreme Court of Texas; $10,000 for representation at the merits briefing stage in the Supreme Court of Texas; and $10,000 for representation through oral argument and the completion of proceedings in the Supreme Court of Texas, plus any and all other taxable costs of court not listed above, are taxed against Defendant.

It is therefore, ORDERED, ADJUDGED and DECREED by the Court that Plaintiffs [] have and recover from the Defendant [BNYM]

the total sum of One Million Three Hundred Fifty-nine Thousand Seventy-one and 65/100 ($1,359,071.20) Dollars, plus any and all other taxable costs of court not listed above, are taxed against Defendant.

It is further, ORDERED, ADJUDGED and DECREED by the Court that any and all relief sought or prayed for by any of the parties hereto or which might have been prayed for herein, which is not herein specifically granted, be and the same is hereby, in all things DENIED.

On February 21, 2023, BNYM filed a Motion for Judgment Notwithstanding the Verdict and Alternatively Motion to Vacate Judgment, and BNYM also filed a Motion for New Trial. On March 30, 2023, the trial court denied both motions. BNYM timely appealed from the Final Judgment.

## Issues on Appeal

In its first appellate issue, BNYM argues the trial court erred in refusing to submit a question to the jury on whether there was a "meeting of the minds" by the parties as to all essential terms of the Rule 11 Agreement. In issues two and three, respectively, BNYM asserts that the trial court erred in refusing to set aside the jury's verdict regarding the Halls' claim for negligent misrepresentation and claim for TDCA violations. BNYM contends in its fourth issue that, even if the Halls established their right to recover under the TDCA, the damages awarded for mental anguish, credit injury, and value of the agreement as received compared to as represented are not supported by legally or factually sufficient evidence. BNYM's fifth issue challenges the evidence supporting the jury's award to the Halls for $265,146.15 in attorney's fees.

57

## Trial Court's Refusal of BNYM's
## Requested Jury Question on Contract Formation

In its first issue, BNYM argues that the trial court erred in refusing to submit a question to the jury over contract formation because the evidence at trial "reflected that the parties did not have a 'meeting of the minds' as to all essential terms of the Rule 11 Agreement." According to BNYM, although the parties expressed intent to contract, there was no meeting of the minds as to the essential terms of the contract because of the dispute over whether the Halls' $19,000 cash contribution was to be applied to pay down the modified debt or paid in addition to the amount of the outstanding balance after modification. BNYM contends that the charge submitted to the jury "errantly assumed the Rule 11 Agreement was a valid contract" existing between the Halls and BNYM and that "[t]he evidence and pleadings in this case raise the issue of whether the parties had a meeting of the minds as to essential terms of the Rule 11 Agreement regarding the cash contribution." Accordingly, BNYM argues that the trial court's failure to submit the disputed element of the Halls' breach of contract claim constitutes reversible error. BNYM further argues that because it preserved error at the charge conference, this Court must measure the sufficiency of the evidence against the charge the trial court should have submitted, and that the great weight of the evidence from the Halls and BONYM "undermined an essential element of a breach of contract cause of action[]" – whether contract formation occurred given the lack of a meeting of minds regarding the $19,000-figure payment.

58

The Halls argue that BNYM's counsel drafted the Rule 11 Agreement and Exhibits 8, 9, and 10 demonstrate that while negotiating the agreement the parties mutually assented that the trial period payments would reduce the $57,000 principal balance. The Halls also contend the e-mails exchanged between Parsons and BNYM's counsel after the execution of the Rule 11 Agreement underscore that the parties mutually assented that the trial period payments were to apply to the $57,000 balance. The Halls further argue that BNYM's argument that the trial period payments and $22,000 in loan forgiveness were to reduce the principal balance of the loan ($96,565.32) to achieve a $57,207.95 figure is untenable because the equation would result in a $55,755.61 figure that is actually below the $57,000 principal balance and because the $22,000 figure "was not a creature of the Rule 11 Agreement but the alleged error that caused the first lawsuit[]" as explained in Parsons' testimony.

The standard of review for alleged error in the jury charge is abuse of discretion. *Lake Conroe Med. Ctr., Ltd. v. KMT Bldg. Co.*, 290 S.W.3d 541, 548 (Tex. App.—Beaumont 2009, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or if it acts without reference to any guiding rules or principles. *Barron, Stark & Swift Consulting Eng'rs, LP v. First Baptist Church*, 551 S.W.3d 320, 322 (Tex. App.—Beaumont 2018, no pet.) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)). "The goal of

the charge is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely." *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999). The trial judge must submit to the jury the controlling questions, instructions, and definitions raised by the pleadings and supported by the evidence. *See Triplex Commc'ns v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995); *see also* Tex. R. Civ. P. 278. The trial court has broad discretion to fashion the jury charge, so long as it is legally correct. *Rodriguez*, 995 S.W.2d at 664. A trial court may refuse to submit a question to the jury if (1) there is no evidence, (2) there are no pleadings, or (3) the issue is uncontroverted. *See City of Keller v. Wilson*, 168 S.W.3d 802, 814-15 (Tex. 2005) ("uncontroverted issues need not be submitted to a jury at all[]"); *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992) (courts are required to submit requested questions to the jury if the pleadings and any evidence support them); *Brown v. Goldstein*, 685 S.W.2d 640, 641 (Tex. 1985) (a trial court may refuse to submit an issue only if no evidence warrants its submission). We will not reverse a judgment based on charge error in the absence of harm, which results if the error "probably caused the rendition of an improper judgment[]" or "probably prevented the petitioner from properly presenting the case to the court of appeals." Tex. R. App. P. 44.1(a); *see Harris Cnty. v. Smith*, 96 S.W.3d 230, 234-35 (Tex. 2002); *Lone Star Gas Co. v. Lemond*, 897 S.W.2d 755, 756 (Tex. 1995) (per curiam).

During the charge conference, BNYM submitted a proposed Question No. 1 for the jury charge that asked, "Was the Rule 11 Agreement a valid contract?[fn]" The footnote to the proposed question cited this Court's decision in *Compass Bank v. Collier* for the proposition that when "[t]he evidence and pleadings . . . raised the issue of whether the parties intended the Commitment Letter to be to a binding agreement or whether it contained conditions precedent to the formation of a valid contract . . . a question regarding contract formation, specifically intent, should have been submitted to the jury." *See* No. 09-19-00112-CV, 2020 Tex. App. LEXIS 8646, at *16 (Tex. App.—Beaumont Nov. 5, 2020, no pet.) (mem. op.).[6] At the charge conference, defense counsel argued:

---

[6] The defense also proposed instructions for the proposed jury Question No. 1 including the following proposed instruction that stated the following and included a footnote citing to *Compass Bank v. Collier*, No. 09-19-00112-CV, 2020 Tex. App. LEXIS 8646, at *16 (Tex. App.—Beaumont Nov. 5, 2020, no pet.) (mem. op.):

For the Rule 11 Agreement to be valid, all six of the following conditions must have been met:[fn]

1. Trustee made an offer;

2. the Halls accepted in strict compliance with the terms of the offer;

3. Trustee and the Halls had a meeting of the minds on the essential terms of the Rule 11 Agreement (mutual assent);

4. Trustee and the Halls both consented to those terms; and

So, Your Honor, we believe that there should be a question and the first question should be whether or not the Rule 11 agreement was a valid contract under the *Compass Bank v. Collier* case with an instruction on the six - - on the five conditions laid out in that case for the formation of a valid contract.

The trial court refused the submission of the proposed jury question and explained:

THE COURT: Going by what - - the evidence that the Court saw and heard and the means in which the case was presented, I don't think that there was a genuine issue of material fact as to the actual formation of the Rule 11 agreement or whether or not the Rule 11 agreement was a valid agreement. So I don't - - I don't believe that it is necessarily warranted that the - - that that question be submitted to the jury. I think the testimony of the witnesses was sufficient to establish that the Rule 11 agreement was a valid contract - - was a valid agreement.

A Rule 11 agreement is a contract relating to litigation. *Shamrock Psychiatric Clinic, P.A. v. Tex. Dep't of Health & Human Servs.*, 540 S.W.3d 553, 560 (Tex. 2018) (per curiam). Texas Rule of Civil Procedure 11 provides that agreements between attorneys or parties touching any pending suit must be in writing, signed, and filed with the papers as part of the record. Tex. R. Civ. P. 11. To be effective, a Rule 11 agreement must consist of a written memorandum which is complete within itself in every material detail, and which contains all the essential elements of the agreement. *Shamrock Psychiatric Clinic*, 540 S.W.3d at 561. The enforcement of a written settlement agreement is governed by principles of contract law. Tex. Civ. Prac. & Rem. Code Ann. § 154.071(a). Thus, we construe Rule 11 agreements under

---

5. Trustee and the Halls executed and delivered the Rule 11 Agreement with the intent that it be mutual and binding.

the same rules that apply to construction of a contract. *Shamrock Psychiatric Clinic*, 540 S.W.3d at 560; *see Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995)).

A plaintiff claiming breach of contract must prove: (1) the existence of a valid contract; (2) the plaintiff's performance or tendered performance; (3) the defendant's breach of the contract; and (4) damages as a result of the breach. *Trahan v. Fire Ins. Exch.*, 179 S.W.3d 669, 674 (Tex. App.—Beaumont 2005, no pet.); *see also S & S Emergency Training Sols., Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018) (citing *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018)). The existence of a valid contract is one of the essential elements of a breach-of-contract claim. *See Trahan*, 179 S.W.3d at 674. Parties form a binding contract when the following elements are present: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds as to subject matter and essential terms; (4) communication of each party's consent to the terms of the agreement; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Sullivan v. Smith*, 110 S.W.3d 545, 548 (Tex. App.—Beaumont 2003, no pet.) (citing *McCulley Fine Arts Gallery, Inc. v. "X" Partners*, 860 S.W.2d 473, 477 (Tex. App.—El Paso 1993, no writ)); *see David J. Sacks, P.C. v. Haden*,

266 S.W.3d 447, 450 (Tex. 2008) ("A meeting of the minds is necessary to form a binding contract.").

Whether a meeting of the minds occurred in a particular case is usually a matter for the jury. *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 746 (Tex. 1988); *WTG Gas Processing, L.P. v. ConocoPhillips Co.*, 309 S.W.3d 635, 643 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). However, the issue may be determined as a matter of law in some cases. *WTG Gas*, 309 S.W.3d at 643; *see also Compass Bank*, 2020 Tex. App. LEXIS 8646, at *17 (stating that the Texas Supreme Court has acknowledged that in certain circumstances, intent to be bound could potentially be decided as a matter of law) (citing to *R.R. Comm'n of Tex. v. Gulf Energy Expl. Corp.*, 482 S.W.3d 559, 575 (Tex. 2016)). "'Meeting of the minds' describes the mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract." *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 720 (Tex. App.—Fort Worth 2008, pet. dism'd) (citing *Weynand v. Weynand*, 990 S.W.2d 843, 846 (Tex. App.—Dallas 1999, pet. denied)). "Mutual assent, concerning material, essential terms, is a prerequisite to formation of a binding, enforceable contract." *Id.* (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)). The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind. *Copeland v. Alsobrook*,

3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied). In making this determination, a court must necessarily review "the communications between the parties and . . . the acts and circumstances surrounding those communications." *Id.* at 605; *see also Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 132 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd) ("In construing the contract, we consider how a reasonable person would have used and understood the language, by pondering the circumstances surrounding the contract's negotiation, and by considering the purposes which the parties intended to accomplish by entering into the contract.").

The trial court concluded that there was a binding enforceable Rule 11 Agreement when the court refused to submit the jury question submitted by BNYM. We cannot say the trial court erred in reaching this conclusion. Parsons testified at trial that a Rule 11 agreement is a binding and enforceable contract between the parties, and that in this case, the parties reached an agreement and reduced it to writing. He testified that the fact that the parties had agreed to settle the case was not only clear from the language in the Rule 11 Agreement but also clear because of the language in the letter stating that the trial court would be notified that the case had been settled so that the case would be removed from the trial docket for the January 2, 2018 trial setting. Both BNYM's corporate representative and the Hughes Watters corporate representative testified that the Rule 11 Agreement is an enforceable

contract that bound BNYM and that the Halls complied with the agreement. The parties do not dispute that they intended to be bound by the Rule 11 Agreement. The Rule 11 Agreement was filed with the trial court in the first suit on December 27, 2017 to evidence the settlement, and the first suit was removed from the trial docket. The parties agree that the claims in the first suit were later dismissed. The Halls made payments in compliance with the Rule 11 Agreement, BNYM accepted and cashed the trial plan payments set forth in the Rule 11 Agreement, and the Halls continued to make payments on the loan under the Rule 11 Agreement for years with coupons from a coupon book provided by BNYM.

BNYM cites to this Court's opinion in *Compass Bank* in support of BNYM's argument that the trial court erred in refusing the requested jury question because BNYM argues the evidence was disputed as to whether the parties had a meeting of the minds as to the terms of the Rule 11 Agreement. In *Compass Bank*, the plaintiffs filed suit against Compass Bank asserting multiple claims and sought injunctive relief to prevent the bank from foreclosing on their house after they defaulted on their mortgage and repeated loan modification attempts. 2020 Tex. App. LEXIS 8646, at *1. Plaintiffs alleged the bank breached a contract to modify the loan, violated the Texas Deceptive Trade Practices-Consumer Protection Act, and violated the TDCA. *Id.* A jury found that the bank breached a July 10, 2013 letter agreement ("Commitment Letter"), that the bank's conduct after December 29, 2013 knowingly

violated the DTPA, and that the bank's conduct after December 29, 2013 violated the TDCA. *Id.* On appeal, the bank raised five issues, one of which challenged the plaintiffs' breach of contract claim on the basis that the Commitment Letter was not a valid, enforceable contract to permanently modify the loan as a matter of law. *Id.* at **2, 11. The Commitment Letter sent to plaintiffs provided that the bank "by virtue of this letter, is entering into an agreement to offer [plaintiffs] hardship assistance through the Loss Mitigation Department." *Id.* at *5. The letter asked the plaintiffs to review the terms and conditions and to sign the agreement and return to the bank by July 17, 2013, in order for the agreement to be valid. *Id.* at **4-5. The "terms and conditions" of the agreement stated that the loan modification "is conditionally approved subject to the below conditions[,]" and that set out the trial period plan payments and, if completed successfully, then the terms of the loan modification. *Id.* at **5-6.

At trial, the first question submitted to the jury was "Did Compass fail to comply with the July 10, 2013 Agreement?" *Id.* at *14. During the charge conference, the bank objected to the question and submitted proposed questions as to whether a contract existed because the bank disputed that a valid contract existed, specifically the element of intent to be bound. *Id.* at **14-15. The trial court refused the questions. *Id.* at *14.

67

On appeal, this Court determined that prior to measuring the sufficiency of the evidence supporting the finding of a breach of contract, we needed to first decide what charge the trial court should have submitted because the bank had objected to the trial court's refusal of the proposed questions. *Id.* at **14-15. This Court concluded that the trial court erred by resolving the contract-formation issue as a matter of law because the "subject to" or conditional language in the Commitment Letter gave rise to a question of fact as to whether the Commitment Letter contained conditions precedent to the formation of a binding agreement of whether the parties' intended to be bound upon the execution of the Commitment Letter. *Id.* at *18. This Court explained that

> The evidence must be legally and factually sufficient to support a finding that a valid contract existed, although the trial court refused to submit such a question to the jury. As submitted, the charge presumed the existence of a valid contract and allowed the jury to find that Compass failed to comply with an Agreement without first determining whether a valid contract existed, despite it being the parties' central dispute at trial.

*Id.* at **18-19.

*Compass Bank* is distinguishable from the present case. Here it is undisputed that the parties intended to be bound by the Rule 11 Agreement, and a commitment letter is different from a Rule 11 agreement that is a binding and enforceable contract.

68

The fact that the Rule 11 Agreement did not specifically state that the plan payments would reduce the $57,000 debt does not in and of itself create a disputed fact issue as to whether the parties to the agreement had mutual assent as to that term. Earlier on the same day that the BNYM's counsel drafted and sent Parsons the Rule 11 Agreement, McCammon sent Parsons the following e-mail:

> I've consulted with SLS and they are unwilling to negotiate regarding the credit reporting letter. SLS was not servicing the loan at the time when the payment was made, however, records from the prior servicer reflect one or more discrepancies regarding the instructions that the Halls[] provided regarding how payment was to be applied to their account. Without the prior servicer independently verifying their error, if any, SLS cannot and will not adjust the credit reporting or provide the requested correspondence.
>
> As discussed, SLS will provide a loan modification as follows:
> - The total debt owed on this note after off-sets by SLS will be $57,207.95 (which will be refinanced at 4% interest for 18 years).
> - The Halls will make timely payments of:
>   $19,244.39 (Feb 2018 pmt)
>   $582.16 (Mar 2018 pmt)
>   $582.16 (Apr. 2018 pmt)
> - Which will be credited toward the debt owed above.
> - Taxes and Ins. escrowed.
>
> SLS is also prepared to enter into a separate agreement, independent of the settlement agreement, for the payment of $1,250 with the Halls.
>
> Please discuss this with your clients and let me know their response.

Parsons responded with his client's dissatisfaction regarding the credit reporting issue. McCammon then sent proposed language for the Rule 11 Agreement and

69

Parsons responded that his clients accepted the terms and that once a Rule 11 agreement is received the court would be notified of the settlement so the impending trial could be cancelled. Then McCammon responded in an e-mail, "Great news! I am drafting settlement documents and will email it to you and Michael this afternoon." Furthermore, McCammon's e-mails during the negotiation reflected that she corrected Parsons on misunderstandings of the terms such as the 70-cent difference in the amount of the debt, but she never indicated to him as of the signing of the Rule 11 Agreement that her client was not agreeing to the term that the trial period payments would reduce the $57,000 debt. In fact, Raab, SLS's corporate representative, testified that BNYM's suggestion at trial that the $19,000-figure does not go to pay down the $57,000 balance is not found anywhere in BNYM's counsel's e-mails to Parsons. Varner's subjective belief that McCammon had purposefully worded the Rule 11 Agreement so that it did not specifically state that the plan payments would reduce the $57,000 debt because McCammon could not get SLS to approve that item also does not create a fact issue on the element of mutual assent. We conclude that based on the Rule 11 Agreement and the communications between the parties and circumstances surrounding those communications that the trial court did not err in concluding that the parties had a meeting of the minds that the $19,000 figure trial plan payment would reduce the $57,000 balance. *See Copeland*, 3 S.W.3d at 605; *see also Cook Composites, Inc.*, 15 S.W.3d at 132. Therefore, the trial court

70

did not abuse its discretion in refusing the proposed jury question. Accordingly, we need not address BNYM's factual sufficiency argument as to contract formation. Issue one is overruled.

## Trial Court's Refusal to Set Aside the Jury's Verdict as to the Halls' Negligent Misrepresentation Claim

In BNYM's second issue, it argues that the trial court erred in refusing to set aside the jury's verdict regarding the Halls' claims for negligent misrepresentation. According to BNYM, the jury's answer to Question 1, finding that BNYM breached the contract between the parties, negates the Halls' ability to recover for negligent misrepresentation as a matter of law because recovery for breach of contract is mutually exclusive of recovery for negligent misrepresentation. BNYM also challenges the legal sufficiency of the evidence supporting the jury's finding of a negligent misrepresentation because, according to BNYM, a negligent misrepresentation must be one of an existing fact and not of promised future performance and the trial court refused to give an instruction regarding what type of conduct constitutes a negligent misrepresentation that was necessary to enable the jury to render a proper verdict. BNYM further argues that the Halls' negligent misrepresentation claim should have been barred by the application of the economic loss rule because the Halls' complaints relate only to the parties' contractual relationship and therefore cannot form the basis of a tort claim as a matter of law. BNYM also challenges the factual sufficiency of the evidence supporting the jury's

71

findings that BNYM made a negligent misrepresentation on which the Halls justifiably relied to their detriment and the jury's awards of past and future economic losses.

A trial court should grant a motion for judgment notwithstanding the verdict when: (1) the evidence is conclusive and one party is entitled to recover as a matter of law; or (2) a legal principle precludes recovery. *See B&W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 15 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also* Tex. R. Civ. P. 301. The standard of review for the denial of a motion for judgment notwithstanding the verdict is the same as for the denial of any motion that would render a judgment as a matter of law. *See Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller*, 168 S.W.3d at 823. A court of appeals reviews an appellant's challenge to a trial court's grant or denial of a motion for JNOV under a legal sufficiency standard. *See City of Keller*, 168 S.W.3d at 823 ("[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review.").

As the sole judges of the credibility of the witnesses and the weight to give their testimony, the jurors may choose to believe one witness and disbelieve another. *Id.* at 819. In our appellate review, we "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at

827. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* An appellant attacking the legal sufficiency of an adverse finding on which it did not have the burden of proof at trial must demonstrate that there is no evidence to support the adverse finding. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011).

When a party attacks the factual sufficiency of the evidence pertaining to a finding on which the party did not have the burden of proof, we may set aside the finding only if, after considering all the evidence, it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *see also Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019). In reviewing factual sufficiency, we do not substitute our judgment for the jury's. *See Windrum*, 581 S.W.3d at 781.

First, the jury's answer to Question 1, finding that BNYM breached the contract between the parties, does not negate the Halls' ability to recover for negligent misrepresentation as a matter of law. In *Johnson v. Bank of America, N.A.*, this Court explained:

> In *Sharyland Water Supply Corp. v. City of Alton*, the Texas Supreme Court explained that the "'economic loss rule'" is "something of a misnomer[.]" 354 S.W.3d 407, 415 (Tex. 2011). However, a basic understanding of the rule, as applicable to this case, is that a party should only be able to recover in contract and not in tort when the injury is limited purely to economic losses suffered to the subject matter of a

73

contract. *James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A., Inc.*, 403 S.W.3d 360, 365 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

Texas courts have generally applied the economic loss rule in cases involving defective products and in cases involving the failure to perform a contract. *Sharyland*, 354 S.W.3d at 418. The economic loss rule has also been applied in cases involving claims for negligent misrepresentation. *See D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663-64 (Tex. 1998) (per curiam). To determine whether the economic loss rule applies, we consider "'both the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff.'" *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45 (Tex. 1998) (quoting *Crawford v. Ace Sign, Inc.*, 917 S.W.2d 12, 13 (Tex. 1996)). We look at the substance of the cause of action and not simply the manner in which it was pleaded to determine the type of action that is brought. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 617-18 (Tex. 1986). "The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Id.* at 618. In some circumstances, a party's actions may breach duties simultaneously in contract and in tort. *See id.* To maintain a separate tort action, the plaintiff must show that he has "suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 797 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *D.S.A.[,] Inc.*, 973 S.W.2d at 664).

. . .

The burden to prove an independent injury is on the plaintiff claiming negligent misrepresentation. *Plano Surgery Ctr. v. New You Weight Mgmt. Ctr.*, 265 S.W.3d 496, 503 (Tex. App.—Dallas 2008, no pet.).

Nos. 09-12-00477-CV & 09-13-00004-CV, 2014 Tex. App. LEXIS 11900, at \*\*29-30, 32 (Tex. App.—Beaumont Oct. 30, 2014, no pet.) (mem. op.) (footnote omitted).

74

Here, the Halls' claim for breach of contract concerns BNYM's breach of the terms of the Rule 11 Agreement. In the Halls' petition, they alleged that BNYM breached the Rule 11 Agreement by failing to provide a loan modification, pay the Halls the $1,250 provided for in the agreement, and provide credit reporting in compliance with its standard procedures. The Halls' claim for negligent misrepresentation, on the other hand, relates to false representations BNYM made regarding the status of the booking of the loan modification after BNYM received the loan modification and that the loan modification referenced in the Rule 11 Agreement "was in place." The evidence showed that in July of 2018, BNYM informed Parsons that the loan was being processed. Parsons testified that he never received a fully-executed loan modification and Raab testified that SLS had never counter-signed the original loan modification. Parsons testified that Parsons and the Halls relied on these representations and continued to make payments to BNYM. BNYM also informed Parsons that it was working to resolve the issue but there was no evidence presented that over the roughly three-year period prior to suit being filed that BNYM made any real effort to locate or investigate the lost original loan modification, which supports the Halls' position that BNYM was never intending on booking the modification. Also, BNYM provided a coupon book to the Halls to make their loan payments after the Rule 11 Agreement was signed but reported the Halls' payments as insufficient even though they were timely and in the amount

75

provided by the coupon book. The evidence at trial also showed that BNYM's alleged "forgiveness" of the $22,469.22 amount (which is an amount that the Halls contend they never should have been charged in the first suit) also resulted in tax liability and impacted their ability to get financing at a car dealership.

The Halls' negligent misrepresentation claim would not be barred by the economic loss rule, because, as we have already determined, the Halls' negligent misrepresentation claim is based on a separate injury and the economic losses are independent of those recoverable under the Halls' breach of contract claim. *See Sterling Chems., Inc.*, 259 S.W.3d at 797.

Also, we cannot say the trial court abused its discretion in refusing the requested jury instruction on negligent misrepresentation. Jury Question No. 5 stated the following:

> Did [BNYM] make a negligent misrepresentation on which Plaintiffs justifiably relied to their detriment:
> Negligent misrepresentation occurs when –
> a.     A party makes a representation in the course of its business in a transaction in which he has a pecuniary interest,
> b.     the representation supplies false information for the guidance of others in their business, and
> c.     the party making the representation did not exercise reasonable care or competence in obtaining or communication the information[.]
> Answer "Yes" or "No".

During the charge conference, the defense requested Defendant's Proposed Instruction A to Question No. 5:

76

A negligent misrepresentation is the misrepresentation of an existing fact rather than a promise of future conduct.

The following exchange occurred:

[Defense counsel]: With regard to Question No. 5 for the negligent misrepresentation, we're going to ask that the Court [] also provide this instruction, Defendant's Proposed Instruction A, that a negligent misrepresentation is the misrepresentation of an existing fact rather than a promise of future conduct.

Comes straight out of the *Miller* [*v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 379 (Tex. App.—Houston [1st Dist.] 2007, no pet.)], which is a negligent misrepresentation case; and that's how the Court defines [] what must be proven in that case. In order to establish a negligent misrepresentation, the plaintiff must also prove that the defendant misrepresented an existing fact rather than a promise of future conduct. That's where we pulled it from, and we are requesting that it be included in the negligent misrepresentation question.

THE COURT: Any response from the plaintiffs?

[Plaintiffs' counsel]: Sure. It's not in the PJC. The case they cite does not suggest that that was a necessary instruction that failed to be provided to the jury, and that was the reason for the reversal. As I recall, that was a factual sufficiency discussion in that case.

So like I said yesterday in the informal charge conference, these citations to cases I've seen from defense counsel in all these trials are ping pongs. I can start peeling out statements to put in for myself. I think we should stick with the PJC.

THE COURT: I agree. I tend to think that on this issue, if something looks as -- even the sufficiency of the evidence, if the evidence doesn't reflect that there was misrepresentation of existing fact versus promise of future conduct, then obviously it's not there in the evidence. It doesn't matter what the jury will be charged on. The verdict that they had answered affirmatively [] wouldn't be supported by the evidence.

[H]aving looked at the PJC -- and I did look at the *Miller* case that you had referenced -- I try to focus on authority [] that deals with charging issues and instructions. So [] I note that in terms of cases that

77

state that [] either it's error to not include a particular instruction, then obviously that's a pretty compelling authority to include it; or if it is authority that says that a PJC instruction is one that is in error, then obviously that's something else we can follow up with.

But I think that just looking at the authority, I don't know that that by itself would warrant having to give an additional instruction that's not contained within the PJC. So I'll overrule the objection; but the proposed Instruction A we'll make part of the record in terms of allowing you to make a proper preservation of your objection. . . . The request is denied, or the objection is overruled.

A proper jury instruction must (1) assist the jury; (2) accurately state the law; and (3) find support in the pleadings and the evidence. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000); *see also* Tex. R. Civ. P. 278. The court should not burden the jury with surplus instructions. *Acord v. Gen. Motors Corp.*, 669 S.W.2d 111, 116 (Tex. 1984). Every correct statement of the law does not belong in the jury charge. *Maddox v. Denka Chem. Corp.*, 930 S.W.2d 668, 671 (Tex. App.—Houston [1st Dist.] 1996, no writ).

We review a trial court's refusal to include an instruction in the jury charge for an abuse of discretion. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). "The trial court has considerable discretion to determine necessary and proper jury instructions." *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). "When a trial court refuses to submit a requested instruction, the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Mandlbauer*, 34 S.W.3d at 912; *see* Tex. R. Civ. P. 277.

The trial court noted during the jury charge that it did not believe that the requested instruction found support in the pleadings and evidence. Question No. 5 as submitted to the jury tracked the Texas Pattern Jury Charge for negligent misrepresentation. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC 105.19 (2022). The defense's requested instruction does not arise from the Texas Pattern Jury Charge, and the *Miller* case cited by BNYM does not require the inclusion of the requested instruction. *See Miller*, 229 S.W.3d at 379. We cannot conclude that the proposed instruction was "reasonably necessary to enable the jury to render a proper verdict[]" so that the trial court's refusal probably caused the rendition of an improper verdict. *See Mandlbauer*, 34 S.W.3d at 912.

That being said, even assuming without deciding that the evidence outlined above regarding the representations about the status of the loan modification, as well as the improper credit reporting which occurred after the Rule 11 Agreement was signed, would provide some evidence to support a finding of BNYM's negligent misrepresentation, we conclude there is no evidence to support the jury's monetary awards for past and future economic loss. The jury charge properly instructed the jury that "Economic damages for negligent misrepresentation are limited to those necessary to compensate the party for the pecuniary loss caused by the misrepresentation." *See Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex.

79

1991). At trial, the Halls' counsel argued during closing arguments that the appropriate award for past economic losses was $13,934 for the checks "in the circle of death[]" that were cashed but were negatively reported to credit bureaus and that the appropriate award for future economic losses was $79,464.71 for the Halls' future loan payments. The jury awarded $15,000 for past economic damages and $85,000 for future economic damages to compensate the Halls for their reliance on BNYM's negligent misrepresentation. It is undisputed that the Halls were ultimately given credit against the loan for the payments they made, and there is no evidence in the record to suggest that the Halls suffered any tangible economic loss due to the negligent misrepresentation or that they would not receive credit for future payments on the loan. Accordingly, there is legally and factually insufficient evidence to support any award for past or future economic loss. We sustain issue two.

### Trial Court's Refusal to Set Aside the Jury's Verdict as to the Halls' Claim for TDCA Violations

In BNYM's third issue, it argues that the trial court erred in refusing to set aside the jury's verdict regarding the Halls' claims for TDCA violations. BNYM contends that the evidence is legally and factually insufficient to support the jury's finding that BNYM violated sections 392.304(a)(8) and 392.304(a)(14) of the Finance Code.

**A. Violations Alleged under Section 392.304(a)(8)**

Section 392.304(a)(8) prohibits the use of "fraudulent, deceptive, or misleading representation" by a debt collector, including "misrepresenting the character, extent, or amount of a consumer debt[.]" *See* Tex. Fin. Code Ann. § 392.304(a)(8). Relying on *Compass Bank v. Collier*, BNYM argues that the Halls' claim under section 392.304(a)(8) of the Finance Code fails as a matter of law because discussions regarding loan modification do not concern the "character, extent, or amount of a consumer debt." *See* 2020 Tex. App. LEXIS 8646, at **41-42. This Court noted in *Compass Bank* that "[f]ederal courts interpreting the TDCA have repeatedly held that 'statements regarding loan modifications do not concern the "character, extent, or amount of consumer debt"' under section 392.304(a)(8)." *See id.* at *37 (citing *Chavez v. Wells Fargo Bank, N.A.*, 578 Fed. App'x, 345, 348 (5th Cir. 2014); *Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 723 (5th Cir. 2013)).

The Halls argue on appeal that BNYM ignores the exception to the prohibition as set out in *Miller v. BAC Home Loans Servicing, L.P.* – that recovery for misrepresentation under section 392.304(a)(8) is recoverable if the plaintiff is unaware "(i) that they had a mortgage debt; (ii) of the specific amount that they owed; (iii) and that they had defaulted." *See* 726 F.3d at 723. According to the Halls, that exception applies here. We disagree. Here, the Halls acknowledged in the loan

modification that they were in default, and the evidence at trial showed that the Halls continued to believe that the loan modification was being processed, they were waiting for the loan modification to be booked, and they continued to make the payments as set forth in the loan modification. We agree that the Halls' claim under section 392.304(a)(8) of the Finance Code fails as a matter of law. We sustain BNYM's third issue as to the Halls' claim under section 392.304(a)(8) of the Finance Code.

## B. Violations Alleged under Section 392.304(a)(14)

Section 392.304(a)(14) of the Texas Finance Code prohibits a debt collector from "representing falsely the status or nature of the services rendered by the debt collector or the debt collector's business[.]" *See* Tex. Fin. Code Ann. § 392.304(a)(14). To the extent, if any, that BNYM argues that the Halls' section 392.304(a)(14) claim is also not actionable in the loan modification context, BNYM failed to cite authority to support this position, and we are not aware of any such authority. *See* Tex. R. App. P. 38.1(i) (requiring appellate briefs to cite to the record and to applicable authority). *Compass Bank* did not involve a claim under 392.304(a)(14) and no court has applied the reasoning in *Compass Bank* to claims under section 392.304(a)(14).

BNYM also argues that the evidence at trial is legally insufficient to support the jury's finding that BNYM violated section 392.304(a)(14) because there is no

evidence in the record to support the finding that the Halls were injured as a result of an alleged violation of the TDCA. According to BNYM, even if some evidence exists to support the finding that BNYM violated section 392.304(a)(14), the evidence is factually insufficient to support the jury's finding that BNYM represented falsely the status or nature of the services rendered by BNYM or its business. *See* Tex. Fin. Code Ann. § 392.304(a)(14).

Here, the e-mail string between Parsons and BNYM's counsel reflected that in July of 2018 BNYM's counsel told Parsons that it was processing the loan modification, whereas the evidence at trial established that BNYM did not decide to book the loan until August of 2021. Prior to August of 2021, the Halls relied on BNYM's representations that the loan modification was being processed, and they continued to send the payment amounts BNYM told them to pay monthly along with the coupon from the coupon booklet BNYM provided to the Halls. Due to the "never ending circle" that the Halls were subjected to, many of the checks were returned because BNYM's system erroneously still showed the original loan in effect because BNYM had failed to book the loan modification. According to the testimony by Raab, the Halls payments were often returned because they were insufficient to cover the payment required under the original loan in BNYM's system and the Halls would then be negatively reported to credit bureaus. David's credit report admitted at trial showed BNYM's derogatory credit reporting at times during the gap in time

83

from when the loan modification was signed by the Halls in 2018 and three years later when it was finally booked in August of 2021. According to Teresa, even until just before the trial, she was receiving alerts that BNYM was reporting her delinquent despite her timely and accurate payments and that no other creditors were reporting her delinquent. On this record, legally and factually sufficient evidence exists to support the jury's finding that the Halls were injured as a result of BNYM's violation of section 392.304(a)(14) of the Texas Finance Code. We overrule issue three as to the Halls' section 392.304(a)(14) claim.

**Award of Damages under the TDCA**

In its fourth issue, BNYM argues that, even assuming the Halls established their right to recover under the TDCA, the damages awarded by the jury in Question No. 4 for mental anguish, damage to credit reputation, and the value of the agreement as received compared to as represented are not supported by legally or factually sufficient evidence.

As outlined earlier in this opinion, when reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *See City of Keller*, 168 S.W.3d at 824. We credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See id.* at 827. We determine whether the evidence at trial would enable reasonable and fair-minded

84

people to reach the verdict under review. *See id.* Jurors are the sole judges of witness credibility and the weight to give to testimony. *See id.* at 819.

In determining whether damages are excessive, we use the same test as for any factual insufficiency question. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986). Under a factual sufficiency review, we "examine all the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust." *Id.* Generally, the amount of damages awarded is a matter uniquely within the jury's discretion. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003) ("[W]hether to award damages and how much is uniquely within the factfinder's discretion."); *Mo. Pac. R.R. Co. v. Roberson*, 25 S.W.3d 251, 257 (Tex. App.—Beaumont 2000, no pet.). "The mere fact that an award is large is no indication of passion, prejudice or improper motive on the part of the jury[.]" *Mo. Pac. R.R.*, 25 S.W.3d at 257. "[I]t is only when the award of damages is 'flagrantly outrageous, extravagant, and so excessive as to shock the judicial conscience,' that it may be disturbed." *Id.* at 257-58 (quoting *Am. Bank v. Waco Airmotive*, 818 S.W.2d 163, 175 (Tex. App.—Waco 1991, writ denied)).

We first address BNYM's challenge to the sufficiency of the evidence supporting the damages awarded for damage to the Halls' credit reputation.

According to BNYM the record is silent as to the Halls' credit prior to the BNYM's alleged acts and that the record is also devoid of any evidence to show that the Halls suffered $90,000 in credit injury in the past or that their future credit injury will be $250,000.

Loss of credit is recoverable as actual damages in a suit where the damage to credit was the necessary and usual result of the defendant's actions. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 688 (Tex. 1981). "'To prove that credit rating is harmed is to prove nominal damages; not until a loan is actually denied or a higher interest rate charged is there proof of actual damages which may be compensated.'" *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 53 (Tex. 1998) (per curiam) (quoting Lawrence A. Cunningham, 5 Corbin on Contracts § 1007 (Supp. 1998)); *Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 199 (Tex. 1998). There must be a showing of injury, as well as proof of the amount of that injury. *St. Paul Surplus Lines Ins. Co.*, 974 S.W.2d at 53; *Provident Am. Ins. Co.*, 988 S.W.2d at 199.

The jury had evidence before it of the Halls' credit reports, showing BNYM's derogatory credit reporting at times during the gap in time from when the loan modification was signed by the Halls in 2018 and when it was finally booked by BNYM in August of 2021. The jury heard testimony that the Halls were charged a higher interest rate when purchasing a vehicle, that BNYM was negatively reporting

86

the Halls to credit bureaus even though the Halls were making timely payments in amounts fixed and agreed to by the bank, that just prior to trial BNYM was still negatively reporting the Halls to credit bureaus, and that BNYM's reporting negatively impacted the Halls credit. Although this testimony meets an initial threshold requirement of an injury, proof of the amount of that injury is also required to recover more than nominal damages. *See St. Paul Surplus Lines Ins. Co.*, 974 S.W.2d at 53. The Halls had the burden to demonstrate identifiable, measurable damages arising from their injury. *See id.* The Halls presented no evidence to quantify their past or future credit injury. Accordingly, we cannot evaluate how the jury determined past loss-of-credit-reputation damages of $90,000 and future loss-of-credit-reputation damages of $250,000. *See Tex. Mut. Ins. Co. v. Morris*, 287 S.W.3d 401, 429 (Tex. App.—Houston [14th Dist.] 2009) (concluding that evidence was legally insufficient to support damages for loss of credit reputation because plaintiff pointed to no "identifiable, measurable damages[]" and no witness "put a dollar amount on the injury" he claimed to have sustained because of denied loans), *rev'd on other grounds*, 383 S.W.3d 146 (Tex. 2012). We sustain issue four as to the award for the Halls' damage to credit reputation in the past and future.

We next address BNYM's challenge to the legal and factual sufficiency of the evidence supporting the awards to the Halls for mental anguish in the past and future. "A damages award for mental anguish will survive a legal-sufficiency challenge

87

when the record bears 'direct evidence of the nature, duration, and severity of [the plaintiff's] mental anguish, thus establishing a substantial disruption in plaintiff['s] daily routine,' or when the record demonstrates 'evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Anderson v. Durant*, 550 S.W.3d 605, 618-19 (Tex. 2018) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)). "Such evidence is more likely to provide the fact finder with adequate details about the extent of the claimant's mental anguish." *Id.* at 619 (citing *Parkway Co.*, 901 S.W.2d at 444). "'[G]eneralized conclusory descriptions of how an event affected a person are insufficient evidence on which to base mental anguish damages.'" *Id.* (quoting *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 232 (Tex. 2011)). While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, juries must find an amount that, in the standard language of the jury charge, "would fairly and reasonably compensate" for the loss. *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002). To recover damages for future mental anguish, the plaintiff must further demonstrate a reasonable probability that compensable mental anguish will persist. *Anderson*, 550 S.W.3d at 619 (citing *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008)).

Here, both David and Teresa testified about their distress and how the BNYM's wrongful conduct affected their relationship and lives. David testified that

88

he has been a police officer for forty-two years and that he had to return to being a police officer after retiring because of the stress at home and because Teresa asked him to go back to work. The jury heard David testify that BNYM's failure to do what the Rule 11 Agreement required has caused a lot of stress between him and Teresa:

> When I come home, it's not a home. It's a house. There's nothing on the walls. My wife has packed everything, being afraid that we might get evicted. So it's just a lot of pressure.
> . . .
> Nothing's in my attic. It was full. Now we have to rent three storage bins. You collect a lot of stuff after 32 years.
> . . .
> [I]t's not a happy home anymore.

The jury observed David become emotional during this part of his testimony, and the jury then heard David explain his embarrassment as follows:

> It's very embarrassing when we were getting notices on our door. I've lived there a long time. My neighbor apparently caught one of the people putting a notice on my door from SLS. And so he kind of approached me, wondering, "Hey, are y'all getting evicted? Do you need some help?"
> You know, that's embarrassing. I mean, I work a lot. So, you know, it just - - it's nice to have neighbors like that; but you don't want them . . . thinking that you're going to not be living there anymore. . . . [I]t's very embarrassing.

David also explained to the jury that he feels BNYM's actions have attacked his credibility within the community, and that BNYM's ongoing litigation has interfered with his daily activities. David testified that because of the ongoing litigation he gets less sleep, and he and his wife sleep in separate rooms. The jury heard Teresa's testimony that the "entire saga" with BNYM has lasted

approximately seven years, and that the current lawsuit has lasted four years. Teresa testified that the litigation with BNYM has caused tension in her marriage, she and David no longer sleep in the same room anymore after 32 years of marriage, she has lost sleep, and it is depressing and "heavy" to come home and look at her house with the knowledge that she is still in litigation with BNYM. She also testified as follows as to the constant angst that the situation caused her over the past years:

> I never know from one day to the next if I'm going to get served with papers saying [] you've got 24 hours to get out because [] they don't have the payments even though they've cashed the checks. So it's like just constantly hanging over your head.

David's and Teresa's testimony reflects a disruption in their lives. We are mindful of the standard of review for legal sufficiency, which requires us to review the evidence in the light most favorable to the jury's verdict and prohibits us from substituting our judgment for that of the jury, especially in evaluating witness credibility and assessing damages. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *City of Keller*, 168 S.W.3d at 822. The Halls stated their home is no longer a "happy home," that David had to come out of retirement from law enforcement and go back to work, and David's and Teresa's constant fears of eviction lasting many years, and the Halls' personal belongings remained packed up in storage bins.

The question remains, however, whether a jury could have reasonably inferred from the Halls' testimony that they suffered "a high degree of mental pain and

90

distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *See Anderson*, 550 S.W.3d at 618-19. Mental anguish is only compensable if it causes a "substantial disruption in . . . daily routine[]" or "a high degree of mental pain and distress[.]" *Parkway Co.*, 901 S.W.2d at 444. We conclude that this evidence was legally sufficient to support the jury's finding of past mental anguish. *See Bentley*, 94 S.W.3d at 604-05 (testimony of stress, loss of sleep, time worrying, and changed behavior as sufficient evidence of mental anguish damages). That said, we agree that the evidence is factually insufficient to support an award of $500,000 for past mental anguish damages because we conclude that the jury's award of past mental anguish for both David and Teresa in a combined amount of $500,000 was "'flagrantly outrageous, extravagant, and so excessive as to shock the judicial conscience[.]'" *See Mo. Pac. R.R. Co.*, 25 S.W.3d at 257-58 (quoting *Am. Bank*, 818 S.W.2d at 175). The evidence was also insufficient to demonstrate a reasonable probability that the Halls will continue to suffer mental anguish. *See Adams*, 265 S.W.3d at 917. We sustain the issue as to BNYM's challenge to the awards for past and future mental anguish, and we suggest a remittitur of $450,000 to modify the judgment so that the total amount of damages for past mental anguish is $50,000.

BNYM also challenges the legal and factual sufficiency of the evidence supporting the award for value of the agreement as received as compared to as represented. The jury answered question No. 4, part 1 as follows:

91

1. The difference, if any, in the value of the Agreement as it was received and the value it would have had if it had been as represented.
ANSWER: $45,000.00[7]

According to BNYM, although the loan modification was not timely booked, the Halls obtained a loan modification containing the terms in the Rule 11 Agreement with debt forgiveness and funded escrow shortage above and received more than the terms of the Rule 11 Agreement had promised. BNYM contends the evidence conclusively established that the Halls suffered no damages between the amount promised in the agreement and the amount received.

The jury heard testimony from Raab, SLS's corporate representative, that BNYM had not initiated any foreclosure proceedings against the Halls since the signing of the Rule 11 Agreement, that Raab believes that the Halls have had no financial losses resulting from their claims and that they actually financially benefitted from the modification agreement, that BNYM did not breach the Rule 11 Agreement and had eventually complied with the terms but it made an error in booking the modification, and that SLS made up for the delay in booking the modification and fixed the mistake. The jury heard testimony from Parsons and the Halls that the parties had agreed under the Rule 11 Agreement that the trial plan payments of $19,244.39, $582.16, and $582.16 would reduce the $57,000 balance

---

[7] The Halls agreed to a remittitur at trial of the $45,000 to $44,127.93.

to $36,799.24. In contrast, Raab testified that instead the three payments had been applied to the original loan balance. The Rule 11 Agreement was published to the jury. The BNYM corporate representative argued that the terms of the Rule 11 Agreement allowed them to apply the three plan payments to the remaining debt amount on the original loan as of December 11, 2017, which was approximately $96,000. Parsons and the Halls testified it was their understanding the three plan payments would be applied to the $57,000 balance which they contend was the amount due and owing at the time of the Rule 11 Agreement. Additionally, the Halls were to receive a $1,250 payment after the releases were signed, and the jury heard David testify that BNYM never paid the Halls the $1,250. The jury heard Parsons testify that the $22,469.22 that had been "forgiven" was something they were entitled to as a result of what had been uncovered during the discovery process during the first case when the bank improperly tried to foreclose on the Halls' mortgage and the bank had mistakenly reported in payoff reports that the Halls owed an "impound advance balance" and for "corporate advances" which totaled $22,469.22. BNYM witnesses did not dispute that explanation for the $22,469.22 credit. Parsons testified that the bank had already agreed in the first case that those charges "didn't make sense" and that was why the bank ended up settling the first case with the Halls. Raab testified that the $22,000 that was forgiven was an offset that represented an amount that the Halls allegedly owed when the foreclosure was

initiated, that the Halls disputed this amount when they filed the first lawsuit prior to the Rule 11 Agreement, and that the forgiveness amount increased to $22,469.22 from the time of the Rule 11 Agreement until the modification because of passage of time, interest accruals, and advances.

Viewed in the light most favorable to the verdict, the evidence is sufficient to allow reasonable, fair-minded people to conclude that there was a difference of $44,127.93 between the value of the agreement the Halls received as compared to as represented. *See City of Keller*, 168 S.W.3d at 819. After considering all the evidence, we cannot say that the award on this issue is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. We overrule issue four as to BNYM's challenge to the sufficiency of the evidence supporting the award of damages for value of the agreement as received compared to as represented.

## Attorney's Fees

We do not reach BNYM's fifth issue challenging the sufficiency of the evidence supporting the attorney's fees award for failure to segregate. *See Barker v. Eckman*, 213 S.W.3d 306, 313-15 (Tex. 2006) (the correct remedy when appellate court substantially reduces damages award is to reverse and remand for a new trial on the issue of attorney's fees).

94

## Conclusion

To summarize, we overrule issue one. We sustain issue two and reverse the portion of the trial court's judgment awarding the Halls $15,000 for past economic loss and $85,000 for future economic loss and render that they take nothing on their negligent misrepresentation claim. As to issue three, we sustain the issue in part and overrule the issue in part. We sustain the issue as to the trial court's refusal to set aside the jury's finding that BNYM violated section 392.304(a)(8) of the Finance Code, and we reverse the trial court's judgment as to that claim. We overrule the issue as to the trial court's refusal to set aside the jury's finding that BNYM violated section 392.304(a)(14), and we affirm the trial court's judgment as to that claim. As to issue four, we sustain in part and overrule the issue in part. We affirm the portion of the trial court's judgment awarding the value of the agreement as received compared to as represented; we reverse the portion of the trial court's judgment awarding the Halls damages for past and future credit injury and render that they take nothing for past and future credit injury damages; we reverse the portion of the trial court's judgment awarding the Halls damages for future mental anguish and render that they take nothing for future mental anguish damages; we suggest a remittitur in the amount of $450,000 as to past mental anguish damages, which would allow the Halls a total of $50,000 in damages for past mental anguish. If the Halls agree to the remittitur and accept only $50,000 in damages for past mental

95

anguish with this Court within fifteen days of this opinion, we will reform the trial court's judgment as to those damages. If the Clerk of this Court does not receive the Halls' remittitur within fifteen days of this opinion, we will reverse the trial court's judgment and remand the cause to the trial court for a new trial. *See* Tex. R. App. P. 61.2. Considering our rulings above, we also reverse the trial court's award of $265,146.15 in attorney's fees and remand the issue of attorney's fees to the trial court for further proceedings. Otherwise, we affirm the judgment of the trial court in all other respects.

AFFIRMED IN PART; CONDITIONALLY AFFIRMED IN PART WITH REMITTITUR SUGGESTED; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART.

LEANNE JOHNSON
Justice

Submitted on August 9, 2024
Opinion Delivered April 3, 2025

Before Johnson, Wright and Chambers, JJ.

96